673 A.2d 932

**In the Interest of G.C., a Minor Child.**

**Appeal of Marvin and Brenda SCHADEL.**

Superior Court of Pennsylvania.

Argued July 12, 1995.

Filed March 20, 1996.

 Del Sole, J., concurred in part, dissented in part, and filed opinion.

Ford Elliott, J., dissented in part and filed opinion in which McEwen, Kelly, and Johnson, JJ., joined.

Thomas L. Wenger, Harrisburg, for appellants.

Jeffrey L. Mensch, Mifflinburg, for appellee.

Leslie W. Bryden, Sunbury, for Amy Pursel, participating party.

Michael J. Robinson, Sunbury, for Northumberland County Children and Youth Services, participating party.

Michael Churchill, Philadelphia, amicus curiae.

Before ROWLEY, President Judge, CAVANAUGH, McEWEN, DEL SOLE, TAMILIA, KELLY, JOHNSON, HUDOCK and FORD ELLIOTT, JJ.

TAMILIA, Judge:

Marvin and Brenda Schadel (hereinafter "appellants") appeal from the September 13, 1994 Order awarding physical custody of G.C., a minor, to David Pursel, G.C.'s maternal grandfather.

On July 24, 1992, G.C. was born to Amy Pursel and Travis C. Less than two months later, on September 21, 1992, G.C. was admitted to Geisinger Medical Center suffering from

trauma, bruising around his left eye, a torn upper frenulum and a displaced left parietal skull. On the same date, a Child Protective Services referral was anonymously filed with the Northumberland County Children and Youth Services (hereinafter "CYS") indicating that G.C.'s injuries were a direct result of serious child abuse. The allegation of child abuse was later substantiated by a CYS investigation and independent medical evidence. The anonymous report also named the following five individuals as potential perpetrators of the abuse: G.C.'s biological mother and father, Amy Pursel and Travis C.; G.C.'s maternal grandmother and grandfather, Julie Miller and appellee/David Pursel; and G.C.'s maternal step-grandfather, Robert Miller.

On September 25, 1992, following his hospitalization, G.C. was placed in the care of appellants, foster parents approved by CYS. G.C. was then adjudicated dependent and legal custody was awarded to CYS pursuant to The Juvenile Act, 42 Pa.C.S. § 6351 Disposition of dependent child. Thereafter, supervised weekly visits were scheduled between the natural parents, David Pursel and G.C. at the foster home. In March of 1993, David Pursel petitioned the court to place G.C. with him. The request was denied but the court allowed G.C. to visit with David Pursel and his wife, at their home, beginning in September, 1993. G.C.'s natural parents then asked appellants to adopt G.C. and appellants agreed and contacted CYS. On February 4, 1994, CYS requested that Amy Pursel voluntarily relinquish her parental rights. Ms. Pursel agreed on the condition that appellants be allowed to adopt G.C. CYS refused the condition and, on March 14, 1994, decided that G.C. would not be placed with appellants. On May 24, 1994, David Pursel filed a petition seeking physical custody of G.C. Appellants responded by filing their own petition to retain custody of G.C.

On September 13, 1994, following three days of hearings on the respective petitions, the Court of Common Pleas of Northumberland County issued an Order granting physical custody of G.C. to David Pursel. Legal custody remains in CYS. This appeal followed.

Oral arguments were presented to a panel of this Court on January 26, 1995 and, on March 20, 1995, we issued an Order that the appeal be heard by the Court en banc.

 The primary issue confronting us is whether CYS foster parents have standing to seek or contest awards of custody concerning their foster children.[1] According to appellants, "Pennsylvania law clearly provides that [foster parents] . . . have the requisite standing to participate in the instant [custody] action. . . ." Appellants' brief at 13. To the contrary, claims appellee/CYS, "[t]he Courts of this Commonwealth have consistently ruled that foster parents do not have standing to question custody decisions." Appellee's brief at 11. Despite the suggestion of these claims that our law is contradictory, we find that overwhelming authority supports the conclusion that appellants herein lack standing.

 Initially, we have discussed standing as follows:

The question of standing is rooted in the notion that for a party to maintain a challenge to an official order or action, he must be aggrieved in that his rights have been invaded or infringed. The law of standing provides that one cannot evoke the jurisdiction of the court to enforce private rights or to maintain a civil action for the enforcement of such rights, unless he or she has, in an individual or representative capacity, some real interest in the cause of action, or a legal right, title or interest in the subject matter or controversy.

*Jackson v. Garland,* 424 Pa.Super. 378, 622 A.2d 969, 971 (1993). "An aggrieved party is one who has a direct, immediate, pecuniary and substantial interest in the subject matter of the litigation." *Insilco Corp. v. Rayburn,* 374 Pa.Super. 362, 372, 543 A.2d 120, 125–126 (1988).

On numerous occasions, Pennsylvania appellate courts have considered the standing of foster parents in custody and adoption proceedings. A thorough review of these cases is necessary to our resolution of this dispute.

---

**1.** The trial court granted provisional standing to appellants in order to develop an adequate record for this appeal.

Most recently, in *Chester County Children and Youth Services (CYS) v. Cunningham,* 431 Pa.Super. 421, 636 A.2d 1157 (1994), we considered a trial court Order sustaining CYS' preliminary objections to the foster parents' petition to adopt on the basis that foster parents lack standing to pursue adoption without agency consent. In reversing the trial court, we held:

> Heretofore, it has been well-established in this Commonwealth that foster parents do not have standing to seek adoption of their foster children when the child welfare agency does not consent to the adoption.... The agency's withholding of consent is not the significant aspect of this precept; rather, it is the nature of the limited relationship of the foster parents to the children.... The significance and parameters of the foster parent relationship were set forth in *Crystal D.R.* and contrasted in [*In re Adoption of*] *J.M.E.* [416 Pa.Super. 110, 610 A.2d 995] [ (1992) ].

*Id.* at 423, 636 A.2d at 1158–1159 (citations omitted).[2]

*In re: Adoption of Crystal D.R.,* 331 Pa.Super. 501, 480 A.2d 1146 (1984), the case cited by *Chester County CYS, supra,*[3] involved an attempt by foster parents to terminate the parental rights of their foster child's biological parents. The foster parents had successfully claimed at trial that they had standing to pursue termination because they stood in *loco parentis* to the foster child. The *Crystal D.R.* court began its analysis by discussing the nature of foster parent status:

**2.** The foster parents appealed our resolution of *Cunningham* to the state Supreme Court, which was unable to produce a majority opinion. *See Chester County Children and Youth Services (CYS) v. Cunningham,* 540 Pa. 258, 656 A.2d 1346 (1995) (three votes for affirmance, three votes for reversal). Hence, by operation of Pa.R.A.P. 3102(d)(1), Quorum and Action, the tied vote affirmed our decision.

**3.** The other case cited by *Chester County CYS* is *In re: Adoption of J.M.E.,* 416 Pa.Super. 110, 610 A.2d 995 (1992). In *J.M.E.,* we held that appellants, a married couple, had standing to adopt the child of a neighbor's relative. However, relying heavily on *Crystal D.R.,* we expressly based our holding on the fact that "[i]t is clear that appellants are not foster parents...." *In re: Adoption of J.M.E., supra* at 116, 610 A.2d at 998. Hence, because *J.M.E.* did not involve foster care, it is inapplicable to the present dispute.

Plainly, foster parents, because they have physical custody of the child, are concerned with the child's day-to-day needs, and therefore they do discharge many parental duties. However, it does not follow from this fact that they thereby assume a status of in loco parentis to the child, distinguished by "rights and liabilities ... exactly the same as between parent and child." The reason that foster parents have physical custody of the child is that it would be impractical for the agency to care for the child. The agency, while transferring physical custody of the foster parents, remains responsible for the care of the child, and *may at any time* required by the child's interests regain physical custody and terminate the foster parent's relationship to the child.

*Id.* at 505, 480 A.2d at 1148–1149 (emphasis added). The court also discussed, as follows, the foster care structure:

The essential feature of this structure is that it divides responsibility for the child's welfare.

. . . . .

Before a child may be placed in a foster home, the home must be approved by the agency. [55] Pa.Code § 3130.39. If their home is approved, the foster parents are paid for providing care for the child. 42 Pa.C.S. § 6306; 62 P.S. § 704.1. The agency supervises the placement, which entails enforcing regulations governing the child's health, § 3700.51, safety, § 3700.67, and discipline, § 3700.63, and in appropriate circumstances the agency may remove the child from the foster home, although the foster parents may [administratively] appeal the removal, [55] Pa.Code § 3700.73. Finally, the agency is itself under the supervision of the Department of Public Welfare. 62 P.S. § 902.

. . . . .

Thus, the Legislature had provided that the relationship between the foster parents and the child is by its very nature subordinate ... to the relationship between the agency and the child. . . .

We recognize that foster parents generally, and appellees in particular, may find this subordinate status painful.

. . . . .

Nevertheless, foster parents may not by pleading their love for the child escape their legal status. . . . When foster parents enter into their relationship with the child, *they know that the relationship is temporary [and] that the agency has the authority to remove the child. . . .*

*Id.* at 509–10, 480 A.2d at 1150–1151 (citations omitted; emphasis added).

In reversing the trial court and holding that foster parents lack standing to terminate parental rights, the *Crystal D.R.* court concluded: "It is the *agency* that is charged with the responsibility of seeking a permanent home for the child, not the foster parents." *Id.* at 512, 480 A.2d at 1152 (emphasis in original).

*Priester v. Fayette County Children and Youth Services (CYS),* 354 Pa.Super. 562, 512 A.2d 683 (1986), also supports the conclusion that appellants herein lack standing. *Priester* involved an attempt by former foster parents to regain custody of their former foster child, who had been removed to another foster home. Citing the United States Supreme Court, we again discussed the nature of foster care:

Foster care has been defined as a 'child welfare service which provides substitute family care for a planned period for a child when his own family cannot care for him for a temporary or extended period, and when adoption is neither desirable nor possible.' *Smith v. Organization of Foster Families,* 431 U.S. 816, 823, 97 S.Ct. 2094, 2099, 53 L.Ed.2d 14 (1977), citing Child Welfare League of America, Standards for Foster Family Care Service 5 (1959).

The distinctive features of foster care are first, " 'that it is care in a *family,* it is noninstitutional substitute care,' and second, 'that it is for a *planned* period—either temporary or extended. This is unlike adoptive placement, which implies a *permanent* substitution of one home for another.' " 431

U.S. at 824, 97 S.Ct. at 2099, citing A. Kadushin, Child Welfare Services 355 (1967). (Emphasis in original). *Priester, supra* at 564, 512 A.2d at 683.

Based on the fact that "foster care is, by its very nature, temporary," we held that "[a]ppellant has no standing to contest this custody determination." *Id.* at 566, 512 A.2d at 685. Importantly, the *Priester* court also relied on *Crystal D.R.*, finding that "[w]e need not address the distinction" between the termination proceeding contemplated by *Crystal D.R.* and the custody proceeding presently at issue. *Id.* at 565, 512 A.2d at 684. Thus, as the court indicates, the absence of standing is not based on the *type* of proceeding brought, but rather on the intrinsic nature of foster care.

Appellants would have us distinguish *Priester* on the basis that it involved foster parents *"who no longer had possession of a child."* Appellants' brief at 16 (emphasis in original). However, as noted, our reading of *Priester* reveals that its holding is rooted in the temporary nature of foster care and, thus, the limited expectations with which foster parents enter the relationship. Indeed, the court notes: "By its very nature, the foster parent/foster child relationship 'implies a warning against any deep emotional involvement with the child since under the given insecure circumstances this would be judged as excessive.'" *Id.* at 565, 512 A.2d at 684, *quoting Crystal D.R., supra* at 510, 480 A.2d at 1151. As this passage clearly indicates, the *Priester* court did not summarily dismiss appellants as former foster parents. Rather, the court was concerned with the "emotional involvement" of the appellants with the child *during* the foster care relationship. The court's reliance on *Crystal D.R.*, a case involving current foster parents, also indicates that its holding was not premised on appellants' status as former foster parents. Finally, the court's finding that legal custody of the child in question remained with CYS [4] further demonstrates that the court was

4. The court noted: "In the case *sub judice,* it seems that [CYS] has legal custody of the minor child under consideration, as seen in contradistinction to mere temporary physical possession...." *Priester v. Fayette*

interested in the divided responsibility inherent to foster care and not in appellants' status as former foster parents.[5]

In addition to *Cunningham, Crystal D.R.* and *Priester,* we also considered the standing of foster parents in *In re: Adoption of S.C.P.,* 364 Pa.Super. 257, 527 A.2d 1052 (1987). In *S.C.P.,* foster parents attempted to adopt their foster child over the objection of the Westmoreland County Children's Bureau. Relying expressly on *Crystal D.R.* and *Priester,* the court held:

> [I]t remains the responsibility of government agencies, such as the Bureau involved here, to seek a permanent home for foster children. It is not the responsibility of foster parents. In *Crystal,* we determined that foster parents had no standing to pursue the termination of the parental rights of a child's natural parents. We reasoned that "the Legislature has provided that the relationship between the foster parents and the child is by its very nature subordinate ... to the relationship between the agency [in charge of foster children] and the child...."
>
> As we stated in *Priester,* the "issues that influence a child's development are among the most important matters that we consider." ... [Instantly, the foster parents] knew that they were embarking on a temporary relationship. They should not be permitted to circumvent the ephemeral expectations upon which the foster parent concept was designed.

*S.C.P., supra* at 261, 527 A.2d at 1054 (citations omitted).

We find that the foregoing authority compels our instant conclusion that appellants lack standing to pursue custody of

*County Children and Youth Services,* 354 Pa.Super. 562, 566, 512 A.2d 683, 684 (1986).

**5.** The Public Interest Law Center files an amicus brief in which they argue:

> *Priester* is inconsistent with the general principles and specific decisions of this court and should be overruled or narrowly limited to cases where either a substantial relationship has not yet developed or where an administrative proceeding would be available.

Amicus Curiae brief at 8. For the reasons enunciated above, we decline the Center's invitation to overrule or limit *Priester.*

G.C. Such a pursuit by appellants would clearly overstep their role in the legislatively-crafted foster care system. Nevertheless, appellants direct our attention to several cases which, it is claimed, require a different result.

Initially, appellants cite *Kellogg v. Kellogg,* 435 Pa.Super. 581, 646 A.2d 1246 (1994), which involved a custody action commenced by the first wife of a man whose second wife had him murdered. First wife sought custody of the children of the second marriage, who were in the custody of their maternal grandparents. The trial court had rejected the grandparents' claim that first wife lacked standing. On appeal, we affirmed the trial court, holding as follows:

> [A third party], in order to be awarded standing, must prove by clear and convincing evidence that he or she has shown a sustained, substantial and sincere interest in the welfare of the child.
>
> . . . . .
>
> The question becomes then, whether the evidence here was sufficient to establish that [first wife] showed a sincere and sustained interest in the boys. The record reveals that she did.

*Id.* at 588–89, 646 A.2d at 1249–1250.

*Kellogg,* which does not involve or discuss foster parents, is clearly distinguishable from the case *sub judice.* As we have stated repeatedly, our denial of standing to foster parents in custody and adoption proceedings is premised on the unique, state-created and agency-maintained relationship of foster care which creates only "ephemeral expectations," *S.C.P., supra* at 261, 527 A.2d at 1054, in those who enter the relationship. In fact, the *Kellogg* court recognized the critical difference between the case before it and those considering foster care when it stated: "In Pennsylvania we find no precedential case or statute addressing directly the standing of a third party seeking custody as against another third party, a non-parent who has both legal and physical custody." *Id.* at 587, 646 A.2d at 1249.

Obviously, the numerous prior decisions involving foster parents, which are discussed *supra*, were available to the court. Nonetheless, because those cases involved foster parents, who by definition do not have "*both legal* and physical custody", they provided no assistance to the *Kellogg* court. Stated simply, because of their unique status, foster parents lack, as a matter of law, the "sustained, substantial and sincere interest" contemplated by *Kellogg*. Hence, *Kellogg* is inapplicable to the instant dispute.

Appellants also cite *In the Interest of Tremayne R. v. Cordelia R.*, 286 Pa.Super. 480, 429 A.2d 40 (1981), as supporting their assertion of standing. While appellants concede that *Tremayne* nowhere discusses the issue of standing, they aver that "recognition of foster parents' standing is necessarily implicit in its decision." Appellants' brief at 14. We disagree. The *Tremayne* court was concerned with, and addressed at length, the allocation of the burden of proof between two third parties to a custody dispute. The fact that *Tremayne* is of no precedential value on the issue of standing was clearly emphasized by the *Kellogg* court, which discussed *Tremayne* as follows:

> In *In Interest of Tremayne Quame Idress R.*, 286 Pa.Super. 480, 429 A.2d 40 (1981), a foster mother and maternal grandmother both sought custody of a child. The trial court ruled that the foster mother should be awarded custody and a panel of this court found no abuse of discretion in that decision and affirmed. While the court discussed the "equally allocated burden of proof" in a custody dispute between two third parties, it did not address the standing issue.

*Kellogg, supra* at 588 n. 4, 646 A.2d at 1249 n. 4. We agree with *Kellogg's* determination that *Tremayne* does not assist a determination of standing in custody disputes.

Finally, appellants direct our attention to *Stapleton v. Dauphin County Child Care Service*, 228 Pa.Super. 371, 324 A.2d 562 (1974), *alloc. denied*, January 6, 1975. *Stapleton* addressed the standing of foster parents to protest, via a petition for custody, an agency decision to remove their foster child.

The child had been declared dependent and the agency had legal custody. The court analyzed the standing issue by turning to the Juvenile Act, then codified at 11 P.S. § 50–101 *et seq.*[6] Specifically, the court quoted from section 50–314, which states:

A petition, which shall be verified and may be on information and belief, may be brought by any person including a law enforcement officer. It shall set forth plainly:

(1) The facts which bring the child within the jurisdiction of the court and this act, with a statement that it is in the best interest of the child and the public that the proceeding be brought and, if delinquency is alleged, that the child is in need of treatment, supervision, or rehabilitation. . . .

11 P.S. § 50–314 (repealed). Based on this section, the *Stapleton* court held as follows:

It is difficult to see how standing could have been defined any more broadly. [The child] was within the jurisdiction of the court below. The Stapletons are "any persons." They therefore had standing to file a petition raising the issue of who should have custody of Brent.

*Stapleton, supra* at 380, 324 A.2d at 567.

Initially, we note that the rationale of *Stapleton* is subject to revisitation because, of a seven-member Court, the majority Opinion represents the view of three of the five judges deciding the case. However, we must acknowledge the authority of *Stapleton's* holding, which clearly grants standing to foster parents in custody disputes.

Appellees, David Pursel and CYS, apparently recognize the difficulty posed by this holding because neither one discusses or even mentions *Stapleton*, despite the fact that it represents the cornerstone of appellants' assertion of standing. Further, our Court has recognized "the apparent conflict between *Stapleton* and *Priester*." See *Mitch v. Children and Youth S.S. Agency*, 383 Pa.Super. 42, 556 A.2d 419 (1989) (declining

6. The Juvenile Act contemplated in *Stapleton* has since been repealed and recodified at 42 Pa.C.S. §§ 6301–6355 (effective June 27, 1978). However, the sections relied on in *Stapleton* have not been changed in any material respect.

to address the conflict because *Mitch* involved prospective adoptive parents rather than the foster parents contemplated in *Stapleton* and *Priester.*) We agree that *Stapleton* conflicts with *Priester,* and today we hold that *Priester,* along with the other authority discussed *supra,* more accurately reflects the role of foster parents intended by the Legislature. Thus, to the extent *Stapleton* conflicts with Pennsylvania law, as enunciated in this Opinion, it is hereby overruled.

We began our analysis by noting that standing requires a direct and substantial interest in the matter at issue. *See Jackson, Insilco Corp., supra.* Based on the foregoing review of Pennsylvania law, we hold that, because foster parents have neither permanent custody of their foster children nor an expectation of permanent custody, the decision of a legal custodian regarding custody does not cause the type of direct and substantial injury necessary for standing.

We are, of course, aware of the vital role played by foster parents in our society and we note with sincere and heartfelt appreciation the tremendous contribution of foster parents generally, and the Schadels specifically,[7] to the foster children of this state. However, the Legislature has determined that governmental agencies, not foster parents, are responsible for the placement of foster children. *S.C.P., supra* at 260–62, 527 A.2d at 1054. Hence, "the Legislature has provided that the relationship between the foster parents and the child is by its very nature subordinate ... to the relationship between the agency ... and the child." *Crystal D.R., supra* at 509, 480 A.2d at 1151.[8] We are powerless to challenge this legislative

7. The record reflects that the Schadels "have been dedicated, loving and responsible parents to the foster children who have entered their family. . . . Mr. and Mrs. Schadel have become invaluable to the Agency due to their dependability and competency as foster parents." *See* Foster Home Evaluation conducted by appellee, Northumberland County Child and Youth Services, 9/2/93, R. 133a. The record also indicates that the Schadels opened their home to no less than eight foster children in 1993 alone. *Id.*

8. Consistent with this statutory "subordination," the Legislature has provided only for a limited administrative appeal of an agency's decision to remove a foster child. 55 Pa.Code § 3700.73 provides:

**§ 3700.73 Foster parent appeal of child relocation.**

determination.[9]

The dissent, in an emotional appeal in defense of the great benefit of foster care and the callousness of denying foster parents the fruits of their involvement, misses the point of the current child welfare policy, emanating from Congress and implemented by the state and county child welfare agencies. The dissent relies heavily on the Opinion in Support of Reversal by Montemuro, J., *Chester County Children and Youth Services (CYS) v. Cunningham,* 540 Pa. 258, 656 A.2d 1346 (1995), in sustaining its position. The dissent totally ignores the fact that, in a split three to three Supreme Court decision, the holding of *this* Court remains the law. That result affirms

(a) Foster parents may appeal the relocation of a child from the foster family except under one of the following conditions:

(1) The child has been with the foster family less than 6 months.

(2) The removal is initiated by the court.

(3) The removal is to return the child to his parents.

(4) The removal is to place the child for adoption.

(5) An investigation of a report of alleged child abuse indicates the need for protective custody removal to protect the child from further serious physical or mental injury, sexual abuse or serious physical neglect as defined in Chapter 3490 (relating to child protective services—child abuse).

(b) The FFCA shall inform foster parents in writing that they may appeal the relocation of a child in accordance with subsection (a) at least 15 days prior to the relocation of the child.

(c) Foster parents who wish to appeal the relocation of a child shall submit to the FFCA a written appeal to be postmarked no later than 15 days after the date of the notice of their right to appeal the child's relocation.

(d) Upon receipt of the foster parent's appeal, the FFCA shall date stamp the appeal and submit it to the Department's Office of Hearings and Appeals, Post Office Box 2675, Harrisburg, Pennsylvania 17105, within 5 working days.

(e) If a foster parent submits an appeal in accordance with subsection (c) and the foster parent has the right to appeal in accordance with subsection (a), the child shall remain in the foster family home pending a decision on the appeal.

(f) Parties to an appeal of a child's relocation may be represented by an attorney or other representative.

*Id.*

9. The Legislature of at least one state, New York, has provided that foster parents who have continuous physical custody of a foster child for more than twelve months have a statutory right to intervene in custody proceedings. *See* N.Y. Social Services Law, § 383(3); *see also Application of Mavis M.,* 110 Misc.2d 297, 441 N.Y.S.2d 950 (1981).

274

the decision the majority proposes here—that foster parents do not have standing to pursue termination of parental rights and adoption of a foster child in their care and by implication, custody in a dependency proceeding in Juvenile Court.

The dissent is correct that *Cunningham* may be distinguished from this case, but rather than strengthening the position of the dissent, it fatally weakens the position.

As this Court stated in *In re Quick,* 384 Pa.Super. 412, 559 A.2d 42 (1989):

> The judge in a [dependency] disposition hearing under Pennsylvania law must focus on the preservation of the family, which is in concert with the best interest of the child, whereas in a termination case, the shift is to an acknowledgement that when the unity of the family cannot be preserved, despite the efforts of private county and state assistance and support, the best interest of the child is best served by freeing the child for adoption and providing a home which meets the requirements for proper parental care. *In re Angry,* 361 Pa.Super. 180, 522 A.2d 73 (1987).

The Preamble to the Juvenile Act, 42 Pa.C.S. § 6301, provides:

> **(b) Purposes.**—This chapter shall be interpreted and construed as to effectuate the following purposes:
>
> (1) To preserve the unity of the family whenever possible and to provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this chapter.

42 Pa.C.S. § 6301(b)(1).

First among all of the purposes enumerated (there are four), is preserving the unity of the family. This is the mandate of the Legislature to CYS and the court and to permit third parties who become physical custodians pursuant to a contract to fulfill a limited role which is enunciated by the Legislature, and implemented through Department of Public Welfare (DPW) regulations, and thereby acquire standing, defeats the purpose of the act requiring reunification of the family, which cannot be sanctioned by this Court.

Foster parents know their position upon assuming the role under contract as foster parents. The good ones (most of them) do their job and take pride and honor in helping the child return to the family. For emotional or occasionally even perverse reasons, some, however, attempt to subvert their role by becoming a party to contested termination/adoption proceedings and/or custody proceedings.

■ Even if *Cunningham* has not drawn a bright line on this issue in denying standing for foster parents in any proceeding involving CYS and the placement of the child, *Stapleton* would need to be revisited because of the dramatic change in philosophy and policy, emanating from Congress which is now national policy, binding upon the states and local county agencies because of the tie into federal reimbursement. That concept has come to be known as Permanency Planning.

Permanency Planning is a concept whereby children are not relegated to the limbo of spending their childhood in foster homes, but instead, dedicated effort is made by the court and the children's agency to rehabilitate and unite the family within a reasonable time, and failing in this, to free the child for adoption.

*See* Adoption Assistance and Child Welfare Act of 1980, Public Law 96–272, June 17, 1980. *In re Quick, supra* at 422 n. 2, 559 A.2d at 47 n. 2 (1989).

Contrary to the ephemeral and glowing endorsement of foster care by the dissent, it has come to be viewed by most practitioners and advocates in the field of child welfare as a failed system. In the 1950s and 60s, foster care was seen as the panacea for deinstitutionalizing orphan asylums, foundling homes, wage homes and farms to place children into stable and happy homes. The reality never lived up to expectations, and for most children foster homes became a "limbo" where they never quite belonged and came to feel rejected by their natural parents, to whom many, if not most, were never returned. In the 70s and 80s, a crescendo of opposition developed to turn permanent placement in foster homes into a short, transitional process bridging the gap between removal

of the child from parents and return to the parents between six and eighteen months later. Failing reestablishment of the family unit, the child was to be placed for adoption and his home, thus, in either way, would be permanent. This, in capsulated form, is the mandate of permanency planning legislation which governs Pennsylvania CYS activities. Contrary to what the dissent would hold, there is no distinction between *Cunningham* and this case; they are simply two aspects of a continuum under federal and state law.

Two authoritative guides to this process, titled *Making Reasonable Efforts: Steps for Keeping Families Together,* and *Keeping Families Together: The Case for Family Preservation,* 1985, Edna McConnell Clark Foundation, have been promulgated by a consortium of the National Council of Juvenile and Family Court Judges, the Child Welfare League of America, the Youth Law Center and the National Center for Youth Law.

In the introduction to these publications, the authors capsulated the deep concern and failure that led to the federal legislation in the following manner:

> Since the creation of the juvenile court in 1899, judges, child welfare workers, and children's advocates have assumed responsibility for helping children and families in crisis. Efforts to serve these children have taken many forms, from the creation of large orphanages and foundling homes to the relocation of children from the city to the country. Eventually, most jurisdictions settled on the present-day foster care system as a way to protect children whose families apparently cannot care for them.

> During the 1970s, Congress and the nation became aware that the child welfare system was not adequately protecting children and their families. Children were removed from their families too frequently, sometimes unnecessarily, and were placed in foster homes or institutions. Once removed, children were seldom reunified with their biological families. Children who could not return to their homes lingered in temporary care rather than going to new homes with adoptive families. Thousands of children were caught for years

in "foster care drift," moving continually from one foster family to another.

*Making Reasonable Efforts, supra,* p. 7.

The Pollyanna view of the dissent as to the benefits of foster care is not shared by the leading experts in the field. To permit *foster parents* to have standing, when the thrust is family unity, gives the opportunity to a third party engaged by contract to interfere with a difficult and emotional process to preserve family unity. That concept was by and large rejected when the philosophy emanating from Joseph Goldstein *et al., Beyond the Best Interest of the Child* (1973), attempted to convince the courts and child welfare agencies that once there was *psychological bonding* between the child and a custodial adult, *regardless of biological relationship,* the psychological parent should prevail. Giving standing to foster parents will rapidly accelerate those claims in our courts and on appeal, when, to a major extent, we have held it is not controlling. Foster parents acquire power without responsibility. They may return or reject a child, but if it happens to be one who fulfills *their own* emotional needs, they would have the power to pursue legal action, sometimes with extensive financial resources which burden the biological parents and CYS. If foster parents were truly in loco parentis, it could be argued they would have both rights and duties. While the dissent states we should not promulgate a *per se* rule preventing standing, pursuant to the policy-making aspect of our judicial role, we may not establish a policy based on the emotional content of one case. The issue is critical to the federal and state mandate and it should not be the individual foster parent who decides when or where to make a stand; it must be the agency as monitored and supervised by the court. Foster parents will always have a voice as one of many interested witnesses from whom the court should or must hear. In some cases, as here, a proper disposition of the case would require that physical care be maintained with the foster parents. Standing is not necessary to reach that disposition.

Failing to make their standard universal, *Beyond the Best Interest of the Child* revisited the issue and authored a work

titled *Before the Best Interest of the Child,* Joseph Goldstein *et al.* (1979). This publication espoused another theory that would place the primary effort on rehabilitating families *before* removal rather than after removal. This approach was accepted more widely and is inherent in the Permanency Planning Policy enunciated above. At no time in the process, before or after removal, is the intrusion of a third party, no matter how loving or protective, as a matter of right supportive of the policy. There are some who would remove the child and deny the role of the family; some who would never remove the child and sacrifice it to the family. The present approach appears to be the balanced compromise to protect the child and preserve family unity when possible. To the extent foster parents need to be considered, the child welfare administrative provisions, *supra,* provide that recourse. It is not the foster parent who needs to be given a role in the ultimate disposition of a child's custody, but the court. As we stated in *In re Quick, supra:*

> Most children are not removed from home permanently nor are the parental rights terminated. The procedure permits the establishment of a baseline, as in medicine, for a determination of progress or deterioration of the child's stability and well being. With the commitment to Permanency Planning under federal and state guidelines, the Juvenile Court Judge becomes the key to monitoring the progress of the child and the effectiveness of the Child Welfare Agency and in determining whether legal mandates have been met in assisting the family toward reunification. No one is in a better position to determine whether the parties have fulfilled their mutual responsibilities toward these goals than the Juvenile Court Judge who was involved with the child from the beginning.

*Id.* at 422, 559 A.2d at 47.

According to the DPW Census of June 30, 1995, there are 15,009 children in foster care in Pennsylvania. To say the least, it is a system which is overwhelmed with responsibility and underfunded. Giving standing to foster parents who are paid for their efforts will further burden a faltering system.

There may be inducement for foster parents to protest removal of a child when recent news reports revealed that a foster parent, particularly a relative, can receive $209 a month more than the same family could receive in welfare benefits. Adoptions are lagging, with 1,400 children in Allegheny County alone awaiting adoptions. The huge deficit in black foster parents for black children has resulted in community and court tensions, particularly when white foster parents, with or without standing, attempt to adopt black children or block return to the biological parents. Granting standing to foster parents will only exacerbate the serious problems plaguing the system. *See* CYS, *Pittsburgh Post–Gazette*, 2/8/96, p. 1.

When words and precedent and treatises fail to convey the nature and depth of a point of view, it is the poet who can crystalize the essence of the problem and perhaps its solution. In "Keeping Families Together," the publishers and authors turned to Maya Angelou, one of America's most eloquent poets of this century to make the point of the need to implement this new national policy.

> Having tried, like most people, so desperately to grow up, and like most people, having failed miserably and miserably often, I am convinced that emerging from the chrysalis of youth as a whole loving adult is the first and greatest challenge which faces the human being. Even when the child's environment is natural, healthy and supportive, the act of growing up is almost impossible.

> . . . . .

> It is known that the struggle, which can continue for years, has the power to destroy the family or reknit it together with stronger bonds. In any outcome, the child feels the dual burden of developing as a distinct person, and being the uniting force of its family.

> How much more strain is put upon the child who is uprooted and thrust among strangers with whom he has no mutual history? How is it possible to convince a child of his own worth after removing him from a family which is said to be unworthy, but with whom he identifies?

When any child, vulnerable as the season's first snow-flake, is handed into a strange atmosphere, even into a rare, sensitive and caring environment, the question which afflicts the newcomer is always, "If I wasn't good enough for my own family, which they say is no good, how can I be accepted here, before strangers?" Tragically, the question is unanswerable and perseveres under the skin, in the viscera through the days, hours, and years into adulthood.

Giving standing to the foster parent benefits, primarily, the foster parent and ignores the best interest of the child.

Based on the foregoing, we are constrained to find that appellants lack standing to pursue custody of G.C. The September 13, 1994 Order of the trial court, as it relates to standing, is therefore affirmed.

However, while we affirm the trial court's Order on the standing issue, our thorough review of the record compels us to vacate the Order to the extent it adjudicates physical custody of G.C. It is of course true that our paramount concern in child custody cases is to determine the best interests of the child. *Choplosky v. Choplosky,* 400 Pa.Super. 590, 584 A.2d 340 (1990). Thus, appellate review of child custody Orders is of the broadest type, *McMillen v. McMillen,* 529 Pa. 198, 602 A.2d 845 (1992), and we may modify the trial court's custody determination where it is shown by evidence of record to be manifestly unreasonable, *In re: David L.C.,* 376 Pa.Super. 615, 546 A.2d 694 (1988); *see also Robinson v. Robinson,* 538 Pa. 52, 645 A.2d 836 (1994) (appellate interference warranted where custody Order is manifestly unreasonable). Further, our review is not bound by the trial court's deductions, inferences and interpretations of evidence and we will exercise independent judgment to consider the merits of the case and to enter an Order that is correct and just. *Bucci v. Bucci,* 351 Pa.Super. 457, 506 A.2d 438 (1986). Keeping in mind these principles, we note the following.

As discussed, *supra,* appellee/David Pursel was listed on the anonymous Child Protective Services referral as a potential abuser of G.C. Although a subsequent CYS investi-

gation was able to confirm, through G.C.'s treating physician, that his injuries were the result of abuse, a perpetrator was never positively identified. *It was established however that G.C. was in the sole custody of David Pursel for nine and one-half hours on September 20, 1992, the day before G.C. was admitted to the hospital. Mr. Pursel was unable to provide an explanation for G.C.'s injuries, although he stated that the child was "cranky" while in his care.* The investigation also revealed that G.C. was in the care of his mother, Amy Pursel, for 12 hours immediately prior to his hospitalization. Ms. Pursel offered four possible accidental causes of G.C.'s skull fracture, none of which explained G.C.'s torn frenulum and all of which were refuted by G.C.'s treating physician.

According to Pennsylvania law, these facts alone constitute prima facie evidence that either David or Amy Pursel perpetrated the abuse suffered by G.C. Section 6381(d) of the Child Protective Services Law, 23 Pa.C.S.A. 6301, *et seq.*, provides as follows:

**(d) Prima facie evidence of abuse.**—Evidence that a child has suffered abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child.

*Id.*

Further, our Court has defined "other person responsible for the welfare of the child" as the child's "caretaker" at the time of the abuse. *See In Interest of J.R.W.,* 428 Pa.Super. 597, 606, 631 A.2d 1019, 1024 (1993) ("The court['s] ... finding as to the abusers need only be established by prima facie evidence that the abuse normally would not have occurred except by reason of acts or omissions of the caretakers."). Thus, under the facts of this case, section 6381(d) operates to narrow the list of G.C.'s possible abusers to David and Amy Pursel.

Nonetheless, because G.C.'s treating physician could not state whether his injuries were sustained before or after Amy Pursel retrieved G.C. from David Pursel, CYS was unable to determine who abused G.C. However, at least two reports filed by CYS indicate their awareness that "[t]he records for David Pursel show that he is listed on the State-wide Central Register as a perpetrator of abuse." R. 131a, R. 139a. While the record does not reflect the circumstances which caused Mr. Pursel's placement on the Register, this fact, along with the identification of Mr. Pursel as a possible abuser of G.C., is clearly sufficient to warrant concern on the part of the agency charged with protecting G.C. Thus, since CYS ultimately recommended to the trial court that Mr. Pursel be granted custody of G.C., we would expect some explanation by CYS of its reason for concluding that Mr. Pursel does not pose a threat to the child. Our review of the entire record reveals, as follows, the sole basis upon which CYS discounted the possibility that Mr. Pursel would abuse G.C.:

There was also a concern of the indicated child abuse report on David Pursel in regards to [G.C.]. However, Mary Ann Pursel does not have a child abuse record and would be able to assure the safety of the minor child.

CYS' Report to the Court, 7/19/94, p. 5, R. 124a; *see also* the Report of 9/2/94, p. 5, R. 119a. Likewise, Carla Snyder, the CYS caseworker assigned to G.C.'s case, testified as follows:

Q. You are aware that Mr. Pursel is on a state register as an abuse perpetrator?

A. Yes. I am aware of that.

Q. What measures did you take in your report to assure yourself that that abuse could not recur?

A. Marianne Pursel does not have an abuse listed with the statewide register.

(N.T., 7/22/94, p. 29.)

We are shocked that Northumberland County CYS literally would wager the life of a four-year old child, who has suffered life-threatening abuse, on the frail hope that an abuser's wife

might intervene on the child's behalf. This "rationale" is even more frightening in light of CYS' additional finding that:

Mr. Pursel has stated that he will be the primary caretaker of [G.C.] [.]

Homestudy, 7/19/94, p. 11, R. 141a.

■ The record does not disclose the necessary comprehensive review by the trial court of the efforts, if any, taken by the agency or other services to educate and counsel those persons most closely associated with the child at the time of abuse on how to parent and avoid further abuse. To fulfill its mandate to return the child to its parents or family, the agency must take affirmative action to counsel the caretakers in parenting and resolving personal problems which underlie and precipitated the abuse. We do not know whether there is a drinking or emotional problem with the presumptive abusers, whether the early background or family history involved abuse, whether there are financial or domestic problems or other reasons which interfere with appropriate parenting.

■ With regard to prospective adoptive or prospective foster parents, the Child Protective Services Law, 23 Pa.C.S. § 6344(d), has been interpreted by the Juvenile Law Center, a distinguished child advocacy association, as follows:

2. Prospective adoptive and foster parents must submit a request for verification to DPW and must submit state and out-of-state criminal record history information and certification as to whether they are named in the central register as the perpetrators of a founded or indicated report of child abuse. *A prospective parent may not be approved by an agency if:*

A. The parent has been named as a perpetrator of a founded report of child abuse committed within five years or less prior to the request for verification. 55 Pa.Code § 3490.123(a),(b), (c) and (d),(1) 23 Pa.C.S. § 6344(d).

*Child Abuse and the Law,* Juvenile Law Center, Fifth Edition

(1995) (emphasis added).[10] The mandate of the Child Protective Services Law, *supra,* alone prevents an award of custody to David Pursel.

In conclusion, while Pennsylvania law does not afford appellants standing to pursue custody of G.C., we have grave concerns about the course recommended by CYS and we find that its adoption by the trial court is "manifestly unreasonable." *David L.C., Robinson, supra.* Hence, while we affirm the finding of the trial court on the issue of standing, we vacate its Order awarding physical custody to David Pursel. We remand for proceedings consistent with this Opinion, which will require a comprehensive review of the family history, the efforts, if any, employed by CYS to counsel and aid the child's mother and grandparents dealing with parental stress and the underlying cause for the abuse. In the meantime, the best interests of the child would require that he be returned to Brenda and Marvin Schadel, the foster parents who have protected and nurtured him since his abuse.

The Order of custody is vacated and the case is remanded for further hearings as to the fitness of the custodians pursuant to this Opinion. The finding of the trial court on the issue of standing of the foster parents is affirmed upon a divided vote by this Court.

Jurisdiction relinquished.

The majority opinion, in its determination that foster parents lack standing, is joined by CAVANAUGH, DEL SOLE and HUDOCK, JJ.

10. The Concurring and Dissenting Opinion by Del Sole, J., finds fault with the majority's interpretation of 23 Pa.C.S. § 6344(d). As stated above, the quote is an accurate summarization of those relevant sections stated in *Child Abuse and the Law.*

As to whether the result would differ if the appellee is the subject of an "indicated" report rather than a "founded" report, no reasonable juvenile court judge would make a decision to return a child to a party on whom an "indicated" report, concerning the child and adult subject of the report, is outstanding (normally cleared in 30 days) for over one year. It is the duty of the juvenile court to make a definitive inquiry as to the reasons for the Department of Welfare's failure to clear an indicated report and to determine with certainty the role played by David Pursel in the alleged abuse.

In its determination that a remand as to custody is necessary, the majority opinion is joined by CAVANAUGH, McEWEN, KELLY, JOHNSON, HUDOCK and FORD ELLIOTT, JJ.

Concurring and dissenting opinion by DEL SOLE, J.

Dissenting opinion by FORD ELLIOTT, J., regarding standing, joined by McEWEN, KELLY and JOHNSON, JJ.

ROWLEY, President Judge, did not participate in the consideration or decision of this case.

DEL SOLE, Judge, concurring and dissenting.

I concur with the majority in holding foster parents lack standing to pursue custody of a foster child. I dissent from that portion of the Opinion that concludes a remand is necessary.

First, I note the report indicating that the grandfather was suspected of possibly being responsible for the child's initial injuries was before the trial court. An experienced trial judge, Judge Barry F. Feudale, concluded:

I'm not prepared to make a determination that the maternal grandfather was the perpetrator of the incident. It's just that he could not be ruled out. It would seem that the more likely perpetrator would have been the Mother or the Father given the time sequence set forth in the report.

(N.T. 9/13/94 p. 7).

Having reviewed the complete record in this case, particularly the C.Y.S. reports, the evidence supports the court's conclusion. It must be remembered that the initial report of suspected abuse arose when the child was presented at a hospital emergency room with serious injuries. The ensuing investigation determined that sometime, at least twelve hours prior to the admission, Appellee had custody of the child. That custody was followed by parental custody for a substantial period. In a shotgun approach, each of the five people that had custody of the child at any time during the 72 hours before his hospital admission was reported by the agency as a

suspected abuser. See CYS report of November 24, 1992, R.R. 146a.

I also note that the CYS report of July 18, 1994 reports that Appellee had a hearing to expunge the "indicated" report of child abuse naming him, but one year later, no decision had been made. Appellee's efforts to respond to the initial report support the trial court's conclusion that he is not an abuser.

The Majority refers to the Child Protective Services Act, 23 Pa.C.S.A. § 6344(d) and The Juvenile Law Center's interpretation of that section. That section states:

(d) **Prospective adoptive or foster parents**—With regard to prospective adoptive or prospective foster parents, the following shall apply:

(1) In the course of causing an investigation to be made pursuant to section 2535(a) (relating to investigation), an agency or person designated by the court to conduct the investigation shall require prospective parents to submit the information set forth in subsection (b)(1) and (2) for review in accordance with this section.

The statute does not, as the Majority states, prevent an award of custody to the grandfather. We must keep in mind that the Appellee was the subject of an "indicated" report, not a "founded" report, and the issue was litigated.

This case was well tried before the trial court. All parties knew of the report of suspected abuse. The foster parents participated in the litigation and raised this issue at trial. It was *not* raised on appeal, but was addressed by the trial court in its decision. Given this record, I conclude the interests of the child have been well protected and suggest we should not substitute our judgment for that of the trial judge.

FORD ELLIOTT, Judge, dissenting.

I respectfully dissent. Accepting the Majority's definition of standing as requiring a direct, immediate, pecuniary, and substantial interest in the subject matter of the litigation, I would find that foster parents meet this standard. The issue before the court in a custody case requires a determination of

the best interests of the child. *See Priester v. Fayette County Children and Youth Services*, 354 Pa.Super. 562, 512 A.2d 683 (1986). Putting aside the obvious pecuniary interests of a foster parent in such proceedings, I would suggest that foster parents who wish to assert that the best interests of the child are met by their retention of physical custody have a direct and substantial interest in the matter at issue. This does not create in them a greater right than the natural parents or CYS. Rather, the court is free to prioritize the interests of foster parents as it sees fit.

Unlike the Majority, I can find no legislative preclusion for a finding of foster parent standing in cases involving custody. In that respect, custody cases are distinguishable from cases concerning adoption or involuntary termination of parental rights. Pursuant to 23 Pa.C.S. § 2531(a), which concerns adoption, "[e]very person now having or hereafter receiving or retaining custody or physical care of any child for the purpose or with the intention of adopting a child under the age of 18 years shall report to the court in which the petition for adoption will be filed." Courts of this Commonwealth have interpreted this language to exclude foster parents from the class of persons entitled to file such reports, unless they are able to obtain the approval of CYS. *Chester County Children and Youth Services v. Cunningham*, 540 Pa. 258, 656 A.2d 1346 (1995) (3–3 decision); *In re Adoption of S.C.P.*, 364 Pa.Super. 257, 527 A.2d 1052 (1987); *In re Adoption of Crystal D.R.*, 331 Pa.Super. 501, 480 A.2d 1146 (1984). Similarly, 23 Pa.C.S. § 2512 limits those persons entitled to file a petition for involuntary termination of parental rights to a parent, an agency, or an individual who has custody of or stands *in loco parentis* to a child and has filed a report of intention to adopt. Foster parents have been refused standing under this statute because they have only physical custody of their foster children, while CYS retains legal custody. *In re Adoption of J.M.E.*, 416 Pa.Super. 110, 610 A.2d 995, *appeal denied*, 533 Pa. 612, 618 A.2d 402 (1992). Importantly, no such statutory preclusion exists for purposes of determining the issue in the present case, namely, whether foster parents

have standing to file a petition to retain custody of their foster children. Nevertheless, the Majority concludes that "over-whelming authority supports the conclusion that [foster parents] lack standing [in such cases.]" Majority slip op. at 263. I cannot agree.

The Majority relies primarily on *Priester, supra,* for its determination that foster parents lack standing in custody cases. Initially, I note that *Priester* is the only case in which a court has held that foster parents do not have standing in a custody dispute. Because we are sitting in *en banc* review, I am prepared to revisit the wisdom of this decision. In *Priester,* the court discussed *In re Adoption of Crystal D.R., supra,* in which the court determined that foster parents had no standing to adopt their foster child without the consent of CYS. That case set forth a policy determination that "[b]y its very nature, the foster parent/foster child relationship ' "implies a warning against any deep emotional involvement with the child since under the given insecure circumstances this would be judged as excessive." ' " *Priester* at 565, 512 A.2d at 684, *quoting In re Adoption of Crystal D.R., supra,* at 510, 480 A.2d at 1151, *quoting* J. Goldstein, A. Freud, and A. Solnit, *Beyond the Best Interests of the Child* 24 (1973). The *Priester* court appeared to base its conclusion that foster parents lack standing in custody matters on this policy rationale. However, the court failed to cite any case law or statute concerning the issue of foster parents' standing in *custody* cases, stating that "[t]here is an absence of controlling authority specifically on point." *Id.* at 566, 512 A.2d at 684. In so stating, the court failed to acknowledge the case of *Stapleton v. Dauphin County Child Care Service,* 228 Pa.Super. 371, 324 A.2d 562 (1974), which addressed this precise issue.

In *Stapleton,* this court considered whether foster parents had standing to file a petition to retain custody of their foster child. In concluding that the foster parents did have standing to file such a petition, we looked to certain provisions of the Juvenile Act, 11 P.S. §§ 50–302, 50–314. Although that Act has since been repealed, the language of the relevant sections presently in effect has not been changed in any material

respect. In considering the language of what is now 42 Pa.C.S. § 6334, which states that "[a] petition ... may be brought by any person including a law enforcement officer," the *Stapleton* court reasoned:

It is difficult to see how standing could have been defined any more broadly. [The foster child] was within the jurisdiction of the court below. The [foster parents] are 'any persons.' They therefore had standing to file a petition raising the issue of who should have custody of [the foster child].

*Stapleton*, at 380, 324 A.2d at 567. While it might be argued that *Stapleton's* interpretation of § 6334 is too broad in that the filing of the petition to initiate proceedings is limited to the initiation of dependency proceedings,[1] we can still look to its rationale, generally, regarding the standing issue because we can find no statutory authority to the contrary that precludes such standing. Rather, we are left with a situation in which there is no legislative dictate either way. *See Kellogg v. Kellogg*, 435 Pa.Super. 581, 646 A.2d 1246 (1994) (there is no statute directly addressing the standing of a third party seeking custody as against another third party). Further, I am persuaded by the following observation of the *Stapleton* Court:

What appears to have caused the confusion in this case is that the distinction between a party's standing and the court's standard of review has been overlooked. The fact that a stranger to the child ... has standing to file a petition with respect to the child implies nothing about the

1. Section 6303(a) defines the scope of the Juvenile Act as follows:
 **(a) General Rule.**—This chapter shall apply *exclusively* to the following:
 (1) Proceedings in which a child is alleged to be delinquent or dependent.
 (2) Transfers under section 6322 (relating to transfer from criminal proceedings).
 (3) Proceedings arising under Subchapter E (relating to dispositions affecting other jurisdictions).
 (4) Proceedings under the Interstate Compact on Juveniles, as set forth in section 731 of the act of June 13, 1967 ... known as the 'Public Welfare Code.' [Emphasis added.]

standard that the court will apply in deciding what action to take on the petition. It may well be that upon examination of the petition and of the evidence, if any, the court will conclude that the petition should be dismissed as of no merit.

*Id.* at 380, 324 A.2d at 567. This observation was echoed by Justice Montemuro in his Opinion in Support of Reversal in *Chester County Children and Youth Services v. Cunningham, supra.* In that Opinion, Justice Montemuro stated:

'[T]he grant of standing does nothing more than allow an interested party to be heard in court; it surely does not amount to an award of custody nor does it change at all the standards by which the court decides the issue. Indeed, the "best interests" of the child remain the paramount concern in these matters.'

*Id.* at 273, 656 A.2d at 1354, *quoting Chester County Children and Youth Services v. Cunningham*, 431 Pa.Super. 421, 428, 636 A.2d 1157, 1161 (1994) (Beck J., dissenting).

The Majority recognizes the direct conflict between *Priester* and *Stapleton.* However, it holds that *Priester* "more accurately reflects the role of foster parents intended by the Legislature." Majority at 272. Thus, the Majority overrules *Stapleton* "to the extent [that it] conflicts with Pennsylvania law, as enunciated in this Opinion...." *Id.*

I cannot find, as the Majority does, that the relationship between foster parents and foster children deprives the foster parent of standing to appear before the court and be heard in the proceedings. Rather, one's status before the court governs rights, burdens, and presumptions to which one is entitled. Further, I cannot agree with the Majority's determination that foster parents should not have standing in custody cases on the theory that foster care, due to its temporary nature, implies a warning against any emotional involvement between the foster parents and the child. *See* Majority at 267–68, 272–73. If this is true, it is a sad commentary on our foster care system indeed. One of the purposes of foster care should not be to create an emotional limbo for a child.

Fortunately, most foster parents do not approach their responsibilities with such sterility. Rather, in providing a caring and supportive environment for children, they realize that there may be emotional involvement. That involvement has risks, and one of those risks is that the children will leave and go on to something better such as returning to a parent, reunification with a sibling, or adoption. Most foster parents are prepared for those risks if they are in the best interests of the child. In today's world, can we ever have too many people concerned with the best interests of a child? To deny standing *per se* to foster parents under circumstances such as those presented in this case is to subordinate the children's best interests to the will of human service agencies.

Finally, I harken to the expression of Justice Montemuro in the Opinion in Support of Reversal in the *Cunningham* case when I say that our Majority opinion today "slams the courthouse door at the behest of a human service agency which has, without the necessity of justifying its action to anyone, determined unilaterally where the best interests of the child lie." *Id.* at 267, 656 A.2d at 1351.

I recognize that *Cunningham* is factually different from the instant case. In *Cunningham*, the foster parents filed a report of intent to adopt without agency consent, and, here, the foster parents merely seek to participate in the custody/placement proceedings. However, the analysis offered by Justice Montemuro is both cogent and instructive:

> Thus, the Opinion in Support of Affirmance creates a rule which grants foster parents 'standing' when the agency approves, yet refuses them 'standing' when the agency disapproves. Under the general principles of standing, there is no logical reason to distinguish between the two situations on this basis. Admittedly, the concept of standing is an amorphous one. Usually, standing is a requirement that parties have sufficient interest or injury in a lawsuit to ensure that there is a legitimate controversy before the court. *See* 59 Am.Jur.2d § 30 *Parties* (1987). Here, the Opinion in Support of Affirmance is not using the concept of standing in its generally accepted sense. Rather,

it is being used as a policy tool to prevent foster parents from adopting their children absent the consent of the agency on a *per se* basis. In effect, foster parents' legal status, and thus their ability to appear before the court, is being determined not by the nature of their relationship to the controversy, but by another party *to* the controversy. As a matter of jurisprudence such a rule as the Opinion in Support of Affirmance sets forth is ill-conceived and contrary to the Act.

... For example, foster parents who obtain the consent of the agency can file a 'Report of Intent to Adopt' and gain review of the court to complete the adoption. However, those who fail to obtain the consent of the agency can go no further as they have no 'standing.' This scheme is contrary to both the letter and spirit of the Act. Our law clearly places the responsibility with the court to make the final determination of what is in the best interests of the child. Nowhere does it grant family service agencies an unreviewable power to determine who can and cannot adopt a child in this Commonwealth. The Opinion in Support of Affirmance erroneously gives these agencies absolute and unreviewable discretion in situations such as the one presented here. However, foster parents should be able to appeal the agency's decision to the court for a determination of whether adoption would be in the best interests of the child. It can be anticipated that in most cases, the court would defer to the considerable expertise of the agency and affirm its decision to withhold consent. However, such a scheme would insure that the courts, not social service agencies, make the final decision as to whether adoption is in the best interests of the child in any given case. This is mandated by the plain language of the Act.

*Id.* at 271–72, 656 A.2d at 1353–1354.

It has long been recognized that a child " 'becomes strongly attached to those who stand in a parental relationship to it and who have tenderly cared for it.' " *Commonwealth ex rel. Bankert v. Children's Services,* 224 Pa.Super. 556, 561, 307 A.2d 411, 414 (1973), *quoting Commonwealth ex rel. Chil-*

*dren's Aid Society v. Gard,* 362 Pa. 85, 96, 66 A.2d 300, 306 (1949). In fact, in *Gard,* at 97, 66 A.2d at 306, our supreme court stated that "[n]othing could be more cruel than forcible separation of a child from *either its real or foster parents* by whom it has been lovingly cared for and to whom it is bound by strong ties of affection...." (emphasis added). Based upon this policy, and because the grant of standing does nothing more than allow an interested party to be heard in court, I cannot agree that foster parents should not have standing in custody cases. Hence, this dissent.