559 A.2d 42

**In re Heather Marie QUICK, Shawn Michael Quick and Stacey Lynn Quick, Minors.**

**Appeal of Dolores Marie Smith QUICK, Mother of the Above Named Children.**

Superior Court of Pennsylvania.

Argued Feb. 28, 1989.

Filed May 11, 1989.

---

Edward A. Olds, Pittsburgh, for appellant.

James A. Hickey, Pittsburgh, for appellees.

Timothy W. Pawol, Pittsburgh, for Children and Youth Services of Allegheny County, participating party.

Before CIRILLO, Presiding Judge, and BROSKY and TAMILIA, JJ.

TAMILIA, Judge:

Appellant appeals an Order entered on August 2, 1988 which made final a decree nisi terminating her parental rights. Appellant is the natural mother of Heather, age 13, Shawn, age 11, and Stacey, age 10, who were first removed from the home in 1979, and were later returned, only to again be removed in 1985 when husband and another man were arrested for sexually abusing them. On February 27, 1985, the children were adjudicated dependent because of physical and sexual abuse by husband and other adults while in the care of mother and husband, resulting in their placement in foster or institutional care. Both appellant and her husband were convicted of three counts of endangering the welfare of children. Appellant was sentenced to serve one to two years imprisonment and she was released from jail on July 8, 1987. On March 17, 1987, a petition for involuntary termination of parental rights was filed by appellee Allegheny County Children and Youth Services, (CYS), seeking termination of the rights of appellant, her husband Kenneth Quick, and an alleged unknown natural father. The rights of the father were terminated by a June 3, 1987 Order by Judge Nathan Schwartz. (Memorandum and Decree, 2/16/88, p. 1.) By an August 11, 1987 Order, Judge R. Stanton Wettick, who had presided over the dependency proceedings, was assigned to Orphan's Court Division at the request of the Administrative Judge of the Orphan's court, for the purpose of hearing the contested termination of mother's rights.[1] On January 4, 1988, moth-

---

1. According to appellee's brief:
   On July 13, 1987 an administrative order was issued by the President Judge of the Court of Common Pleas of Allegheny County which provided that in contested parental termination proceedings involving a dependent child currently placed outside the home of a natural parent, the Administrative Judge of the Orphan's Court Division may request the appropriate Administrative Judge to assign the judge presiding over the dependency proceedings to hear the termination proceedings. Pursuant to this order, the case was transferred to the Honorable R. Stanton Wettick who was presiding over the Quick Dependency matter.
   (Appellee's brief at p. 1.) See also Administrative Order of Court, 7/13/87, Appendix 1 to Order of Court dated 8/2/88.

er presented a motion seeking recusal of Judge Wettick, urging that having previously presided as juvenile court judge, he would have formed opinions based on the evidence, thus depriving her of a fair and impartial termination hearing; this motion was denied the next day. After a hearing, Judge Wettick entered a decree nisi on February 16, 1988 terminating mother's rights pursuant to 23 Pa.C.S. § 2511(a)(5), to which mother filed exceptions. Following argument before the court en banc, the Order in question was issued, and mother timely filed an appeal with this Court.

Appellant first contends the court erred in finding clear and convincing evidence supporting termination was established by CYS. Section 2511(a)(5) provides as follows:

§ 2511. **Grounds for involuntary termination**

(a) **General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(5).

We recently discussed our standard of review of parental termination in *In re Adoption of Hamilton,* 379 Pa.Super. 274, 549 A.2d 1291 (1988), stating:

The evidentiary standard for terminating parental rights was formulated by the United States Supreme Court which established that parental rights may not be

terminated in the absence of clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). In *In re: T.R.*, 502 Pa. 165, 465 A.2d 642 (1983) our state supreme court adopted the reasoning of *Santosky* as a matter of state law applicable to all termination proceedings. This principle requires evidence which is "so clear, direct, weighty, and convincing as to enable the [factfinder] to come to a clear conviction without hesitancy of the truth of the precise facts in issue." *In re Shives*, 363 Pa.Super. 225, 227–28, 525 A.2d 801, 802 (1987) (citation omitted). In assessing whether the trial court's determination is based on clear and convincing evidence, we review the chancellor's findings. *In the Matter of Adoption of G.T.M.*, 506 Pa. 44, 46, 483 A.2d 1355, 1356 (1984), *quoted in In re Adoption of Faith M.*, 509 Pa. 238, 240, 501 A.2d 1105, 1106 (1985); *In re J.G.J., Jr.*, 367 Pa.Super. 425, 532 A.2d 1218 (1987). "Absent an abuse of discretion, an error of law or insufficient evidentiary support for the findings of the Orphans' Court, an appellate court will not reverse a hearing court's order to terminate." *Shives, supra,* 363 Pa.Super. at 227–28, 525 A.2d at 802.

We review the facts, with all conflicts resolved in favor of the Orphans' Court as trier of fact and sole judge of credibility. *In re Adoption of J.J.,* 511 Pa. 590, 515 A.2d 883 (1986).

*Hamilton, supra,* 379 Pa.Superior Ct. at 278, 549 A.2d at 1293.

A review of the evidence in this matter supports the factual findings of the orphan's court regarding the family:

Shawn is seriously retarded. He will always require a living situation that includes adult supervision. Following his removal from his parents' home, he was returned to the foster home where he had lived from 1979 to 1982. He has resided in this home since April 1985. The foster parents have made a long-term commitment to Shawn.

Stacy is a mildly retarded and hyperactive child. She has resided in her current foster home since July 1985.

This is a specialized foster home supervised by the PRYDE program.

Heather is a moderately retarded and emotionally disturbed child. Following her removal, she was placed for approximately one year at Holy Family Institute, a residential treatment program for seriously disturbed children. Thereafter, she spent approximately two months at the John Merck Program which provides intensive treatment to children with serious acting out behavior. From the fall of 1986 to the spring of 1987, she was placed in a specialized foster home supervised by the PRYDE program. This placement failed because of Heather's acting out behavior. In June 1987, she was placed in the PRYDE foster home where her sister Stacey is residing. She continues to reside in this home.

The foster parents of Stacey and Heather have made a long-term commitment to raise Heather and Stacey if they are not returned to a natural parent. Also, they are prepared to adopt both children if the rights of the mother are terminated.

The mother is an intellectually limited woman who comes from a very deprived background. She has an I.Q. of approximately 60 and does not read nor [sic] write. She was one of ten children raised in a home that did not provide structure or nurturing. While growing up, she was sexually abused in her home. Witnesses described her as having extremely low self-esteem and chronic dependency needs.

Following the children's removal, she attended the Mon–Yough MH/MR Base Service Unit for counseling for her immediate needs. She visited her children regularly but did not become involved in any counseling that addressed issues concerning their needs or ways in which she could improve herself as a parent. At that time, criminal charges were pending against her and she was extremely depressed over the events in her life.

On March 14, 1986, the mother was convicted of three counts of endangering the welfare of her children and

sentenced to jail. She was released from jail on July 8, 1987. Following her release, she first lived with her sister, then by herself, and since October 1987 with a boyfriend and his family. She has not begun counseling on any regular basis. However, approximately four weeks prior to trial, she obtained a complete psychological evaluation at the Mon–Yough MH/MR Base Service Unit. Expert witnesses who testified on behalf of the mother said that at some time in the future there is a possibility that she would be capable of raising her children. These witnesses testified that this would require intensive counseling (perhaps on a daily basis) for at least two to three years. Even then, her prognosis is guarded according to these witnesses.

(Slip Op., Wettick, J. and Zavarrella, J. per curiam, 8/2/88, pp. 2–4.)

Mother argues the court erred in concluding the conditions which led to the removal of the children continued to exist at the time of trial. She urges the abusive conduct of her husband and her inability to protect the children from the conduct while she lived with husband led to the removal, and she argues she remedied this prior to trial by leaving her abusive husband, filing for divorce, and setting up a safe new life. Mother further contends her own testimony on cross-examination and the testimony of caseworker Cynthia Cook was not sufficient to sustain the burden of CYS of proving the continued existence of the conditions which led to removal, and the court erred by considering the generalized testimony of her own expert witness regarding attributes of women whose children are sexually abused in the home.

After a careful and comprehensive review of the record, testimony, and briefs, we perceive no abuse of discretion on the part of trial court in finding the condition which led to the removal of the children continues to exist. We agree with the trial court's conclusion that the condition was the mother's inability to protect her children, and that she had not undergone counseling or been involved in any

other treatment program that would make her a more responsible parent. Moreover, as recognized by the trial court, mother continues to operate under the belief that she was in no way responsible for the mistreatment of the children, contrary to the findings of the criminal court and to statements she made to Detective James Heyl to the effect that the abuse had occurred for years and she felt she could do nothing to stop it.

Mother next urges the court erred in finding she could not or would not remedy the conditions which led to the removal within a reasonable period of time, and she argues CYS did not produce clear and convincing evidence the conditions could not be remedied.

We are not persuaded by appellant's argument or the cases cited by her (which involve factual circumstances distinguishable from those at hand) that the court abused its discretion in finding clear and convincing evidence existed as to her inability or unwillingness to remedy the conditions which led to removal of the children. The following finding of the trial court was based on competent evidence.

We accept the testimony of the mother's witnesses (Dr. Hayes and Mr. Rahls) that appropriate treatment must include intensive therapy designed to alter drastically the mother's personality traits, that if the mother became involved in intensive therapy, any changes would probably not occur for at least two to three years, that with this treatment it is possible that the mother would make these changes over this time, and that even if the mother became involved in treatment, there is a substantial likelihood that the treatment would not be successful.

(Slip Op., pp. 8–9.)

The trial court further found, based upon the evidence, that Mon–Yough MH/MR was available to provide the appropriate treatment to appellant, and that appellant was aware of these services which could be provided and knew how to arrange for them, yet did not. Further, the court found she had been advised of her eligibility to participate in parent counseling and training through the PRYDE

Program, yet she did not attend parenting programs. We perceive no abuse of the trial court's discretion regarding the determination that mother cannot or will not remedy the conditions within a reasonable time, because as she admits, it was her inability to protect the children from abusive conduct which led to the removal (*see* Appellant's Brief at p. 17), and, even if she would participate in an intensive day parent therapy program, the chances are slim that she would be fit to resume parental care within a reasonable time. This complies substantially with the requirements laid down by the Supreme Court in *In re Adoption of Michael J.C.*, 506 Pa. 517, 486 A.2d 371 (1984), that where the parent has demonstrated a continued inability to care for the child in a safe environment and the evidence is clear and convincing that the behavior is irremediable, termination of parental rights is justified.

■ Mother additionally argues the court's finding that termination would meet the needs and welfare of the children is not based on clear and convincing evidence. To the contrary, the trial court Opinion sets forth all of the testimony which clearly weighed in favor of termination when examining the needs of the children. The court pointed to the testimony which pertained to the special needs of the children, and was particularly concerned about their need for stability and certainty. It was convinced termination would best accommodate their special needs, especially in light of their very satisfactory progress in foster homes which meet their needs. Again, we find no abuse of discretion on the part of the trial court.

■ Mother next contends she was denied her constitutional right to a fair hearing because the judge who presided over the dependency and dispositional hearings of the children in Juvenile Division was assigned to Orphans Division to decide the termination matter. She argues the juvenile court, in dispositional hearings, routinely admits and relies upon hearsay and other prejudicial, inflammatory evidence, which would not be competent evidence in a

termination proceeding, and this information could prejudice a judge's decision on the termination.

This argument is without merit. First, although dispositional proceedings may have a lesser evidentiary standard than adjudicatory hearings under the Juvenile Act, the decision to intervene must be based on clear and convincing evidence and only then can the court consider what is in the best interest of the child, which is the proper function of the dispositional hearing. During that proceeding, the court must find clear necessity to remove the child before custody is placed elsewhere. The fact that a lesser standard is applied for admission of evidence does not obviate the rigorous requirement of finding clear necessity. We fail to see how being party to a dispositional hearing in which removal from the parents' custody was required by clear necessity would prejudice the parent some years later, when the evidence in a termination proceeding establishes the conditions requiring removal have substantially been uncorrected. Secondly, adoption and termination procedures are logically and traditionally construed to be family matters. The consistent thread, over many years flowing through the management of family cases, has been that so far as possible the judge who initially heard the family matter should remain with it to its conclusion. Indeed, one of the most disruptive and disconcerting factors in multi-judge jurisdictions is the fragmentation of different aspects of a family case resulting from the hearing by several judges of different stages of a particular proceeding. Family problems are complex but intricately intertwined so that the best treatment so far as the parties are concerned, particularly in regard to children, as well as the most consistent and efficient approach from the judicial point of view, is for the same judge to remain involved with the family along the continuum of the particular case. Unless it was unavoidable, it would be self-defeating for the judge assigned to the termination case to be a different judge than the one who heard the dependency case. The argument by appellant that a de novo hearing was necessary, so that bias emanating from prior hearings on dependency would not infect the

termination proceedings, is unmerited unless it can be established that bias actually existed in fact. It is not uncommon, but rather the rule, that children involved in juvenile and custody matters over many years, return to the same judge. Most children are not removed from home permanently nor are the parental rights terminated. The procedure permits the establishment of a baseline, as in medicine, for a determination of progress or deterioration of the child's stability and well being. With the commitment to Permanency Planning [2] under federal and state guidelines, the Juvenile Court Judge becomes the key to monitoring the progress of the child and the effectiveness of the Child Welfare Agency and in determining whether legal mandates have been met in assisting the family toward reunification. No one is in a better position to determine whether the parties have fulfilled their mutual responsibilities toward these goals than the Juvenile Court Judge who was involved with the child from the beginning. A new judge will not have the benefit of recall of hearings, reports and directions not fully detailed in the cold or abbreviated reports and records presented at the termination proceeding. That is not to say these recollections will be the basis for the termination decision, which must stand on its own evidence and be established by clear and convincing evidence. Rather, it will assure the record is full and complete so that termination will not be granted if the agency is overreaching, or termination won't be denied because of a pro forma presentation. Indeed, to assure this continuity, discussion is being had and movement in favor of including termination proceedings in the Juvenile Act is underway in some states.

In support of her position appellant cites a Washington state case, *In re Dependency of Hiebert*, 28 Wash.App. 905,

**2.** Permanency Planning is a concept whereby children are not relegated to the limbo of spending their childhood in foster homes, but instead, dedicated effort is made by the court and the children's agency to rehabilitate and unite the family within a reasonable time, and failing in this, to free the child for adoption. *See* Adoption Assistance and Child Welfare Act of 1980, Public Law 96–272, June 17, 1980.

627 P.2d 551 (1981), for the proposition that a parent at a termination proceeding should have a right to a judge different from the one who presided over the dependency proceeding. There, the judge at the dependency disposition proceeding considered termination. Because that case was decided under a state statute which is dissimilar to that in Pennsylvania, it is inapposite to her argument. Appellant also argues grounds for recusal exist in situations where a judge has heard inflammatory and prejudicial testimony in a prior proceeding which would not be admissible in a subsequent proceeding, and she contends that in the current situation, there is an "underlying unfairness to the parent whenever the judge in the termination proceeding has been exposed to a lengthy period of prior dispositional hearings." (Appellant's brief at p. 44.)

The judge in a disposition hearing under Pennsylvania law must focus on the preservation of the family, which is in concert with the best interest of the child, whereas in a termination case, the shift is to an acknowledgement that when the unity of the family cannot be preserved, despite the efforts of private county and state assistance and support, the best interest of the child is best served by freeing the child for adoption and providing a home which meets the requirements for proper parental care. *In re Angry*, 361 Pa.Super. 180, 522 A.2d 73 (1987). It is unsupportable that an experienced trial judge is incapable of making factual determinations and legal findings in regard to the same child at different hearings, based on separate statutory and philosophic considerations, without being subject to bias or prejudice. Appellant was afforded ample opportunity by the trial judge to produce any allegation of prejudicial or inflammatory matter which was offered to the court during the dependency hearing which might have been inadmissible in a termination proceeding, but her counsel could produce none nor does she point to any on appeal.

Quoting *Commonwealth v. Lewis*, 314 Pa.Super. 298, 460 A.2d 1149 (1983), our Court, in *Commonwealth v. Bristow*,

372 Pa.Super. 48, 538 A.2d 1343 (1988), discussed the circumstances under which a trial judge should recuse himself:

The determination of whether a trial judge should recuse himself depends upon the following:

... "the type of evidence that the judge hears; if the evidence is inadmissible and is of a highly prejudicial nature, the judge should recuse himself or declare a mistrial if it is too late for recusal." The judge should also recuse himself whenever there is substantial doubt as to his ability to preside impartially. The burden to show prejudice, however, is on the party seeking recusal. "If the evidence is admissible, or not of a highly prejudicial nature, recusal is not required," and while it may be the better practice to have a different judge preside over trial than preside over pre-trial proceedings, such a practice is not constitutionally required and has not been made the basis for setting aside a verdict reached in an otherwise proper trial. *This principle appears to be based on "the prevailing view that judicial fact-finders are capable of disregarding prejudicial evidence."*

*Id.*, 372 Pa.Superior Ct. at 52, 538 A.2d at 1345 (emphasis added). As we noted above, appellant does not point to any highly prejudicial or inadmissible evidence which was placed before the trial judge at the dependency and disposition proceedings. She does, however, urge Judge Wettick should have recused himself because a serious doubt as to his impartiality has been raised. The "serious doubt" she points to is an alleged excerpt from a report of a CYS caseworker made after a June 1986 review hearing.

At the 6–4–86 Consolidated Review Hearing before Judge R. Stanton Wettick, C & YS presented recommendations that parental rights to all C'N be terminated, that the C'N be placed for adoption, and that visitation with the NM be reduced from twice a month to once a month. It was apparent from the outset that Judge Wettick was very much in favor of his C & YS recommendation for termination of rights. Throughout the hearing, he cut

off questioning from the Ps' attorneys whenever they were attempting to make a point critical of the C & YS' recommendation.... [I]t is certain that Judge Wettick will take his first opportunity to terminate rights of [parents] involved and allow the [children] to be placed for adoption.

(Appellant's brief at 45.)

In his Opinion the trial judge states that to the best of his knowledge he had no discussions or contacts with the caseworker or other CYS officials regarding the Quick matter aside from the court proceedings, and, since the caseworker was not called by mother as a witness at the recusal hearing, he was not able to discover what the caseworker meant by the statement. The court then explains his belief that he could render an impartial decision in this matter. Slip Op. at 26–27. Because appellant failed to sustain her burden of demonstrating any inability on the trial judge's part to render an impartial decision, we find no error in his refusal to recuse himself.

Appellant additionally contends the Pennsylvania legislature has mandated that juvenile and termination proceedings be conducted separately, and to permit the same judge to preside over the dispositional proceedings and the involuntary termination proceedings violates the statutory scheme devised by the Pennsylvania General Assembly. She argues the Orphans' Court Division in Allegheny County has been given exclusive jurisdiction over termination proceedings under 20 Pa.C.S. § 711, whereas the Juvenile Section of the Family Division has jurisdiction over dependency and dispositional proceedings under the Juvenile Act, 42 Pa.C.S. § 6301 *et seq.*, and juvenile proceedings are to be conducted separately from other proceedings, citing 42 Pa. C.S. § 6336(a).

■ In this assertion appellant is not correct. A historical review of this matter discloses no determination by the legislature that the Orphans' Court or Orphans' Court judges are exclusively mandated to hear termination pro-

ceedings. The Pennsylvania constitutional amendments of 1968 provided at Article 5, Schedule to Judiciary:

ALLEGHENY COUNTY

### § 17. COURTS

. . . .

(b) Until otherwise provided by rule of the court of common pleas, the court of common pleas shall exercise jurisdiction in the following matters through the family court division:

. . . .

ii) Juvenile Matters: All matters now within the jurisdiction of the juvenile court.

iii) *Adoptions and Delayed Birth Certificates.*

Const. sched. art. 5 § 17 (emphasis added). This section brought Allegheny County into conformity with the law and practice that had heretofore applied only to Philadelphia. *See* 20 Pa.S.C. 713, and const. sched. art. 5 § 16, Schedule to Judiciary Article. By rule of the Common Pleas Court soon after adoption of the 1968 amendments, the Allegheny County Common Pleas Court returned jurisdiction in these matters to the Orphans' Court Division. The Probate, Estate and Judiciary Code, 20 Pa.C.S. § 711(7), requires jurisdiction in adoptions be exercised in Orphans' Court (exception, Philadelphia). The procedure adopted by the Administrative Judge of Orphans' Court in its Administrative Order of July 13, 1987, as to termination proceedings, recognizes, at least in respect to the cases involving adjudicated dependent children subject to termination proceedings, the wisdom of section 17(b)(iii) and section 16 as it applies to Philadelphia. While the alignment of subject matter jurisdiction by Article 5, Schedule to Judiciary, to the various divisions established by the Constitution cannot be ignored, *Posner v. Sheridan*, 451 Pa. 51, 299 A.2d 309 (1973), this does not prevent the assignment of judges to the division exercising jurisdiction for the purpose of hear-

ing some or all of the matters heard in that division. This Order prevented the problems posed by *Baskin Sears v. Edward J. Boyle Co.*, 506 Pa. 62, 483 A.2d 1365 (1984), which held that pursuant to the Judicial Code, 42 Pa.C.S. § 952, while divisions of a court are administrative units in which is vested the full jurisdiction of the whole court, the business of the court may be allocated to divisions by general rule. No contrary rule has been promulgated in Allegheny County, pursuant to the Schedule to Judiciary, to remove this matter from Orphans' Court.

Thus it appears that while Orphans' Court has been allocated the business of determining adoption (termination) proceedings pursuant to law, there is no infringement of that allocation by the assignment of a Family Division Judge, by court Order, to hear a termination case. The Schedule to Judiciary, Article 5, Section 20, and Rule 702(2) of the Pennsylvania Rules of Judicial Administration provide for such assignments to expedite the business of the court.

We find the statutory scheme is not compromised by the Administrative Order in question; rather, as detailed by the trial court's well-reasoned Opinion, permitting the judge who presided over the dependency and dispositional proceedings in Juvenile Division to sit in the termination proceeding is an effective and expeditious way to process these matters.

Finally, in a related argument, mother contends that because she relied on the belief a de novo termination proceeding would be held, she believed she did not have to be vigilant in monitoring the admissibility of evidence and preserving issues in the Juvenile Court proceedings. She argues the "retroactive effect" of the Administrative Order is fundamentally unfair and violative of due process considerations, because the statutory scheme creates a reasonable expectation of a de novo termination proceeding before a judge other than the one who presided at the Juvenile Court proceedings. As we decided in the preceding argument, the statutory scheme does not provide for a different judge to

sit at the two proceedings, so that any expectation that she did not have to object to certain evidentiary offers or preserve certain issues in the dependency proceeding, based upon such a belief, was unreasonable and unfounded. Moreover, the juvenile hearings were recorded and the files of the Children and Youth Service contained all of the reports, psychological data and service plans which were available on demand to support any contention that the conclusion to proceed to termination under section 2511 of the Adoption Act was unwarranted. Appellant does not point to any evidence or issues she would have preserved, but merely makes this general argument. Further, the Administrative Order is not retroactive in effect but requires a present finding on evidence adduced in the termination hearing of the failure or inability of the mother to adequately parent. It does not rely on the juvenile hearings per se. Thus, we find the contention to be without merit.

Order affirmed.