J-S86030-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: A.T.P. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.P., NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1074 WDA 2016 |

Appeal from the Order June 17, 2016
in the Court of Common Pleas of Jefferson County
Orphans' Court at No(s): No. 32A-2016 O.C.

| | | |
|---|---|---|
| IN RE: E.J.P.P. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.P., NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1075 WDA 2016 |

Appeal from the Order June 17, 2016
in the Court of Common Pleas of Jefferson County
Orphans' Court at No(s): No. 31A-2016 O.C.

| | | |
|---|---|---|
| IN RE: T.M.J.P. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.P., NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1076 WDA 2016 |

Appeal from the Order June 17, 2016
in the Court of Common Pleas of Jefferson County
Orphans' Court at No(s): No. 29A-2016 O.C.

J-S86030-16

| IN RE: L.R.P. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.P., NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1077 WDA 2016 |

Appeal from the Order June 17, 2016
in the Court of Common Pleas of Jefferson County
Orphans' Court at No(s):  No. 30A-2016 O.C.


BEFORE:  GANTMAN, P.J., MOULTON, J., STEVENS, P.J.E.*

MEMORANDUM BY MOULTON, J.:                **FILED DECEMBER 29, 2016**

A.P. ("Father") appeals the trial court's decree entered June 17, 2016, terminating his parental rights to his children, T.M.J.P., born in September 2013; L.R.P., born in May 2012; A.T.P., born in September 2010; and E.P.P.,[1] born in May 2015 (collectively, the "Children"), under 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[2]  We affirm.

_____

* Former Justice specially assigned to the Superior Court.

[1] E.P.P. is also referred to as E.J. throughout this appeal.

[2] The trial court also held an evidentiary hearing on CYS's petition for involuntary termination of the parental rights of the Children's mother.  In the same decree entered June 17, 2016, the trial court terminated the parental rights of Mother.  In its opinion entered on June 17, 2016, the trial court makes clear that the termination of both parents' rights was under section 2511(a)(2), (5), (8), and (b), and not subsection (a)(1).  **See** Trial Court Opinion, 6/17/16, at 6-7.  On July 1, 2016, Mother filed separate appeals from the decree, assigned Docket. Nos. 980, 981, 982, and 983 WDA 2016.  This Court consolidated Mother's appeals on July 28 2016.
*(Footnote Continued Next Page)*

- 2 -

The trial court accurately and aptly set forth the factual background of this appeal as follows:

> CYS personnel entered the . . . home on October 31, 2014 to investigate a report that the oldest child, [A.T.P.], had sustained a suspicious orbital fracture whose origins the [parents] could not explain. They also found the home to be cluttered and dirty, with dishes stacked in the sink and visible mold. They took emergency custody of [Children] at that time and placed them with [foster parents]. Adjudicated dependent at a subsequent shelter hearing, they have been with the [foster parents] ever since.
>
> As they completed an initial assessment, CYS personnel also discovered that [A.T.P.] was suffering from scabies and that [L.R.P.] had not received all of the medication his doctor had prescribed following his tonsillectomy. In addition, Mother and Father regularly missed the children's medical appointments and had failed to address [A.T.P.'s] vision problem, for which he received corrective eye surgery after being placed with the [foster parents]. Though [T.M.J.P.] also evidenced vision problems and was born with a hole in her heart, moreover, the [parents] had failed to address either condition, while [L.R.P.], though not exhibiting any identifiable medical problems, was underweight and malnourished.
>
> In addition to presenting with an array of medical needs, the children suffered from severe physical delays that Mother and Father failed to adequately address. At four years of age, [A.T.P.'s] speech was limited to a few isolated words that were difficult to understand, while [L.R.P.] and [T.M.J.P.] only made noises, some of which included identifiable vowel and consonant sounds. In addition, [A.T.P.'s] motor skills were underdeveloped and

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

Because of the timing of the filing of Mother's and Father's appeals, a different panel of this Court will address Mother's appeals in a separate Memorandum.

his gait unsteady, and [T.M.J.P.], at eleven months old, could not crawl, roll over, or even sit up on her own.

Mother and Father's neglect, it seems, stemmed from a lack of parental capacity, not necessarily a lack of concern. They did not understand their children's needs or basic parenting principles. As a result, they neglected to provide the mental, physical, and emotional stimulation that was essential to their children's development.

It is impossible for one to remedy an unrecognized problem, though, and the Court questions whether Mother and Father even recognized their children's deficiencies. As Mother testified, it was Dr. Fatula who suggested in 2011 that she contact Amazing Kids to initiate services that would address [A.T.P.'s] delays and Early Headstart that contacted her and offered additional services. It was not that Mother or Father observed and appreciated their son's deficits and took steps to address them. That is not to discount their willingness to follow up and accept help, which they did, but to clarify that their decision to contact Amazing Kids was not unprompted.

By the time CYS took custody of [A.T.P.], [L.R.P.], and [T.M.J.P.], Amazing Kids was also providing services for the younger children, speech therapy and special instruction for [L.R.P.] and occupational therapy and special instruction for [T.M.J.P.]. Visits occurred weekly and lasted approximately one hour, meaning that Amazing Kids had therapists in the home for five or six hours per week. Ranging from skeptical to accepting and cooperative, Mother and Father complied with that regimen such that in-home services, which also incorporated limited parenting training, went uninterrupted from the time they started in 2011 until the children were placed with the [foster parents] in 2014. Upon Mother's request, CYS continued using Amazing Kids' services to facilitate a level of continuity for the children, and under the same service providers' tutelage, the children have made greater strides in the [foster parents'] home than they did in Mother and Father's home.

Unlike [A.T.P.], [L.R.P.], and [T.M.J.P.], E.J. never lived with the [parents]; he has been with the [foster parents] since he was born and has consistently received

- 4 -

appropriate care his entire life. Consequently, his physical, emotional, and mental skills have developed at a normal rate. He is appropriately verbal for his age and has adequate muscle control . . . , is alert and responsive to outside stimuli, and appears to be emotionally healthy.

While some of [A.T.P.], [L.R.P.], and [T.M.J.P.'s] developmental issues may be intractable, the [foster parents] have also made every effort to meet their individual needs. [A.T.P.], for instance, has undergone corrective surgery for his eye condition and is now wearing leg braces, while [T.M.J.P.] is being monitored for possible eye surgery and will be receiving her own leg braces this month.[1] In light of the children's therapeutic progress, moreover, the Court can only assume that the [foster parents] are actively working to help them improve their motor, verbal, and other skills rather than just allowing the therapists access and being satisfied with the few hours of services the children receive from third-party providers.

[1] Mother and Father have participated in securing medical appointments for their children, but only to a very limited extent.

Since losing custody of their children, Mother and Father have undergone a substantial amount of parenting training. They began with an unspecified number of classes with a local pastor and, when CYS caseworker determined that they needed more intensive, hands–on program, began Community Action's "Nurturing Parenting Program." They participated in that program for a total of three hundred days and were taught a variety of skills, some of which they were able to implement during supervised visits with their children. Their progress, however, has been slow, limited, and of questionable permanence. Community Action's court summaries, submitted as Exhibit 1, are exemplary in that regard.

In reports drafted September 17, 2015 and March 18, 2016, respectively, Susie Reed and Lisa Doty proffered positive and optimistic evaluations of Mother and Father's parenting achievements. They also reported both parents' scores from their respective administrations of "Adult-Adolescent Parenting Inventory," the results of which belied the women's subjective evaluations and indicated

that Mother and Father still had moderate to severe parenting deficits. After three hundred days in the program, for instance, Father scored only two out of ten and Mother one out of ten in the "Developing Empathy" category, while both managed only a three out of ten for "Appropriate Discipline" and one out of ten for "Empowering Children." The highest score either of them achieved in any category was six out of ten, which was still two points shy of the established goal. Of serious concern, moreover, was that some of Mother and Father's scores actually declined between testing dates. Those objective scores, divorced from the biases of the evaluators who were personally invested and wanted to see Mother and Father succeed, tended to confirm the caseworkers' and Dr. Ryen's observations about the [parents'] capacity to implement the parenting skills they had been taught and appropriately care for [Children].

Op. of the Court, filed June 17, 2016, at 1-4 ("Trial Court Op.").

On April 11, 2016, Jefferson County Children and Youth Services ("CYS" or the "Agency") filed petitions to terminate Mother's and Father's parental rights with regard to each of the Children. On June 8, 2016, the trial court held a hearing on the petitions. At the hearing, CYS presented the testimony of Casey Lopez, the Children's caseworker, and Allen Ryen, Ph.D., a licensed psychologist specializing in children and families. Father presented the testimony of Laura M. Hertel, the owner of Amazing Kids, L.L.C., an early intervention provider agency contracted by Jefferson County, as an expert in early intervention. N.T., 6/8/16, at 76-78. Ms. Hertel testified that she is familiar with the family in this matter, as she provided services to A.T.P., beginning in March of 2011, speech therapy for L.R.P., and special instruction for T.M.J.P. *Id.* at 78-79. Father then presented the

testimony of Susan M. Reed, who holds a bachelor's degree in crisis and trauma counseling and Christian counseling, and is working on her master's degree. *Id.* at 98. Ms. Reed also holds a certificate in parenting from Family Developmental Resources, and worked with the Nurturing Parent program. *Id.* She worked with Mother and Father on nurturing their parenting every week between June 2015 and January 2016, sometimes as often as three times a week. *Id.* at 98-99. Father testified on his own behalf, as did Mother.

On June 17, 2016, the trial court entered its decree involuntarily terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).

In its opinion accompanying its decree, the trial court stated the following:

> The Court would emphasize that it does not question that Mother and Father love their children and have demonstrated their commitment to being reunited as a family. They attended every one of the sixty-eight, two-and-a-half hour visits CYS offered them in 2015 and have maintained that pattern thus far in 2016. Mother likewise took advantage of the five visits she was afforded in 2014. Both have also complied with the agency's mental health requirements; Father participated in an evaluation from which no follow-up treatment was recommended, and Mother continues to receive mental health services consonant with her provider's recommendations. In addition, Mother and Father have recently acquired a suitable residence.[2] More than a year-and-a-half after having [A.T.P.], [L.R.P.], and [T.M.J.P.] removed from their home, though, they are still unable or unwilling to keep up with their children's medical needs, which was one of CYS's primary concerns in the first place and, given the

children's known conditions, is also a serious concern for the Court. They also have not yet advanced beyond supervised visits in a home-like environment and have failed to demonstrate that they are ready to assume greater responsibility.

> [2] Insofar as that only occurred on May 31, 2016 and is a month-to-month lease, however, it is far from certain that their housing situation will become stable in the near future.

Once again, it is not that Mother and Father are unwilling to develop acceptable parenting skills; it is that they are unable to do so within any reasonable timeframe. Their children were removed from their care approximately nineteen months ago, and despite their consistent efforts and access to relevant service providers, Mother and Father have made only modest improvements in their parenting skills and are nowhere near ready to parent four children on a full-time basis. Given what little progress they have made in the last nineteen months, in fact, the Court wonders whether they would ever be ready for that. Contributing to the Court's uncertainty was the [Parents'] own testimony. Prompted by their attorneys, they agreed that they would need continuing services as they transitioned to being a family of six and indicated that they would solicit help if they needed it. They demonstrated no awareness, however, that taking complete responsibility for raising four children was vastly different than implementing learned parenting skills for a few hours in a home-like environment. It was telling, moreover, that Father saw no irony in asserting that he could support four children while also explaining how he had quit his job in favor of increased social security income and that Mother deemed herself ready to assume the challenges of parenting four children when she could not even accept being challenged by a person whose goal was to help her become a better mother and preserve her family.

Testifying about her tenure with Family Preservation, a service provider that seeks to improve parenting and family functioning, Mother affirmed that she had cooperated with its program until the end. She quit, she said, because she was being pushed. "And I'm not someone who likes to get pushed," she defiantly

- 8 -

announced. Her attorney attempted to rehabilitate her with a series of leading questions about her willingness to cooperate with the same provider in the future. In light of her initial, spontaneous averments, however, her subsequent assurances were unconvincing. She had already informed the Court that she was unwilling to be confronted and challenged. While content to comply with services when the providers were friendly and encouraging, she rebelled when she deemed their demands to be unreasonable and "pushy." Parenthood, though, is full of confrontation and challenges, and Mother is apparently not equipped to handle them.

The [foster parents], on the other hand, are well equipped to handle the challenges of raising four children, three of whom have special needs. They have proven as much in the last year-and–a half. They have loved the children, attended to their medical and therapeutic needs, and in every other way acted as concerned and supportive parents, and [A.T.P.], [L.R.P.], [T.M.J.P.], and E.J. have responded accordingly. As evidenced by their delight at being reunited and going home with [foster mother] at the end of visits with Mother and Father, each implicitly recognizes the love and stability these foster parents have provided, and each has flourished under their supervision.

Conversely, three of the children show little or no attachment to their biological parents. E.J. has never known them as his primary caretakers, and their interactions with him during visits have been too superficial to foster a bond, while [A.T.P.] and [T.M.J.P.] generally prefer playing by themselves even when Mother and Father are present. [L.R.P.] is the exception, as he demonstrates a stronger connection with Mother. His affection for [foster mother] is equally strong, though, which is why he, like his siblings, is happy to be reunited with her after visits. All of the children, while they may indeed enjoy certain structured activities with Mother and Father, implicitly recognize the [foster parents] as their source of love and support. Mother and Father, they silently communicate, are merely peripheral figures in their lives.

Trial Court Op. at 4-6 (footnote in original).

On July 15, 2016, Father timely filed notices of appeal, along with concise statements of errors complained of on appeal, pursuant to Pa.R.A.P. 1925.[3] This Court, *sua sponte*, consolidated Father's appeals on August 9, 2016.

On appeal, Father raises the following issues:

> Whether the Trial Court committed an error in determining the Father lacked parental capacity, and could not remedy this incapacity under 23 Pa.C.S.A. §2511(a)(2)).
>
> Whether the Trial Court committed an error in determining the conditions that led to the children's removal continue to exist and cannot be remedied within a reasonable time under 23 Pa.C.S.A. §2511[(a)](5).
>
> Whether the Trial Court committed an error in determining the conditions that led to the children's removal continue to exist and cannot be remedied under 23 Pa.C.S.A. §2511[(a)](8).
>
> Whether the Trial Court committed an error and/or abuse of discretion in finding that the termination of Father's parental rights was in the best interest of the developmental, physical, and emotional needs and welfare of the child.

Father's Br., at 3-4.[4]

_____

[3] On July 20, 2016, the trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) incorporating the finding of facts and conclusions of law set forth in its June 17, 2016 opinion.

[4] As it appears that the fourth issue in Father's concise statement and brief challenges section 2511(b) determination, and, as he discusses section 2511(b) in his fourth issue, we will consider his challenge to section 2511(b) preserved for our review. **See** Father's Brief, at 4, 14-17. **Cf. Krebs v. United Refining Company of Pennsylvania**, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in
*(Footnote Continued Next Page)*

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re: R.J.T.***, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. ***Id.***; ***R.I.S.***, [614 Pa. 275, 284,] 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. ***Id.***; ***see also Samuel Bassett v. Kia Motors America, Inc.***, 613 Pa. 371[, 455], 34 A.3d 1, 51 (Pa. 2011); ***Christianson v. Ely***, [575 Pa. 647, 654-655], 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. ***Id.***

As we discussed in ***R.J.T.***, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, [608 Pa. at 28-30], 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own

*(Footnote Continued)* ——————————

both his concise statement of errors complained of on appeal and the Statement of Questions Involved in his brief on appeal).

- 11 -

credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, [539 Pa. 161, 165,] 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa.Super. 2009). Moreover, we have explained:

> [t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

***Id.*** (*quoting **In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). We will focus on section 2511(a)(2) and (b), which provide as follows:

> § 2511. Grounds for involuntary termination
>
> (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without

- 12 -

essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

To satisfy the requirements of section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003). The grounds for termination of parental rights under section 2511(a)(2), due to parental incapacity that cannot be remedied, "are not limited to affirmative misconduct[;][t]o the contrary, those grounds may include acts of refusal as well as incapacity to perform

parental duties." ***In re A.L.D.*** 797 A.2d 326, 337 (Pa.Super. 2002) (internal citations omitted).

Father argues that the trial court erred in finding that CYS presented sufficient evidence to support the termination of his parental rights under section 2511(a)(2) because he has demonstrated visible progress in attaining varied parental skills and in remedying his parental deficits. ***See*** Father's Br., at 7. Father states that although Dr. Ryen testified that, "in a real life unsupervised parenting situation, it is not clear that these parents would be able to consistently apply the skills they may have learned. . . ," he left open the possibility of unsupervised visitation between Father and the Children. ***Id.*** (citing CYS Exhibit 4, at 5.

Father also relies on the testimony of Ms. Reed and Ms. Hertel to support his argument that he has the ability to remedy the causes and conditions of his parental incapacity. Father alleges that the record does not support the trial court's determination that the testimony of Ms. Reed and Ms. Hertel lacked credibility, and that we should "disturb" the trial court's credibility determination. Father's Br., at 8, n.1. Father contends that the trial court improperly supported its determination with the testimony of the CYS caseworker, Ms. Lopez, which was based on her attendance at only two supervised visits between the parents and the Children between January and June of 2016. ***See id.*** at 9; N.T., 6/8/16, at 26.

Father argues that the present case is distinguishable from *In re Adoption of: M.E.P.*, *supra*. In *In re Adoption of: M.E.P.*, the mother of the child was mentally challenged, and, even with assistance, did not learn proper parenting skills while the child was in foster care for eighteen months. The mother depended upon her own mother, the child's grandmother, and refused to leave her parents' home or to obtain individual counseling. The mother made remedial measures after the filing of the termination petition, but her remedial measures were insufficient to show that she wished to learn parenting techniques. The mother also showed little interest in achieving her family service plan goals. Thus, the trial court terminated her parental rights under several subsections of section 2511, including (a)(2). Regarding section 2511(b), the trial court found that the mother lived in a place that would be dangerous to the child. The trial court also found that there was no parent-child bond, although the mother loved the child, and that the foster parents provided the child with a stable living environment, and intended to adopt him. We affirmed.

While Father admits that Ms. Hertel and Ms. Reed realistically see the need for in-home services and a parenting "refresher" following reunification, he states that there was not any suggestion that 24-hour parenting assistance was necessary. Father's Br., at 9. Father states that he has become an active participant in the Children's medical and developmental care. Father asserts that, given his progress in achieving

adequate parenting skills, through his consistent investment in overcoming his parenting deficits, CYS has failed to sustain its burden. Thus, Father claims that the trial court abused its discretion in terminating his parental rights under section 2511(a)(2).

In its opinion, the trial court stated as follows:

> To the extent it is not implicit from the above findings, the Court would specify that it did not find Ms. Hertel and Ms. Reed to be credible in their assessments of Mother and Father's parenting skills and family interactions. Unlike Dr. Ryen and the caseworker, they did not have dedicated training in psychology or child development or experience assessing familial needs from the parents' and the children's perspectives. Their roles were instead to be helpers and advocates for the clients they served, and it was apparent from their testimony that their predisposed bias was to emphasize areas of improvement while overlooking or discounting those that were problematic. Given the obvious deficits in both parents and children as of October 31, 2014, moreover, it is nearly impossible to otherwise understand why Ms. Hertel and her staff did not deem conditions at the [family] home to be of particular concern. They did not, though, and that fact alone makes Ms. Hertel's observations and opinions suspect.

Trial Court Op. at 6.

In analyzing section 2511(a)(2), the trial court found as follows:

> Termination is warranted pursuant to subsection (a)(2), however, as Mother and Father plainly lack parental capacity, and their history clearly indicates that they are unable to remedy that situation within a reasonable period of time, if ever.[3]
>
> [3] Under subsection (a)(2), a parent's repeated and continued incapacity, abuse, neglect, or refusal to parent is cause for termination where it has left the child without essential parental care, control, or

subsistence and is not likely to be remedied by the parent.

As the Court has already detailed, Mother and Father displayed severe parenting deficits that, as of October 31, 2014, had left their children without proper medical care and produced substantial and perhaps irreversible developmental delays in [A.T.P.], [L.R.P.] and [T.M.J.P.]. Such was the case even though service providers had been in the home since 2011. Basic parenting classes, parenting help through Amazing Kids and Family Preservation, three hundred days in the "Nurturing Parenting Program," and ongoing mental health services for Mother were only moderately successful in improving their parenting skills.

Nineteen months after losing custody of their children, Mother and Father were still far from being ready to assume the responsibility of raising four children, three of whom had been identified as having special needs. Yes they were able to attend to certain basic physical needs, like changing diapers and preparing meals, and had made progress - Mother more than Father - in the way they interacted with their children. They had only gotten that far after extended and intensive parenting training, though, and, while testifying on June 8, 2016, evidenced a disconcerting lack of awareness about their persisting parental deficits and the skills and fortitude necessary to raise four children. Whether additional parenting training and mental health services could remedy those issues is questionable and, at the very least, would be an extensive process that would leave the children in CYS's custody for an unacceptable length of time. Pursuant to § 2511(a)(2), however, [A.T.P.], [L.R.P.], [T.M.J.P.], and [E.P.P.] do not have to continue waiting indefinitely to see whether Mother and Father can acquire the capacity to appropriately care for them and meet their unique medical and developmental needs on a full-time basis and with only limited help from social service providers. Pursuant to § 2511(a)(2), Mother and Father's rights may be terminated so that the [foster parents] may adopt the siblings and guarantee them a permanent home.

Trial Court Op., 6/17/16, at 7-8 (footnote in original).

As there is competent evidence in the record that supports the trial court's findings and credibility determinations, we find no abuse of the trial court's discretion in finding that Father's parental rights should be terminated under section 2511(a)(2). ***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012).

Next, Father argues that CYS failed to satisfy its burden of proof under section 2511(b). He contends that, although the Children undeniably have special needs, he would continue to exert efforts to address those needs during a reunification process. Father states that, after only two supervised visits and, based on an eight-month-old bonding assessment, Ms. Lopez testified that termination was in the best interests of the Children. Father challenges Ms. Lopez's assessment with the testimony of Ms. Reed and Mother that there is a positive interaction between Father and L.R.P. Father emphasizes that the trial court found that he and Mother love the Children, and have demonstrated their commitment to being reunited as a family. ***See*** Father's Br., at 15-16 (citing N.T., 6/8/16, at 16). He does not challenge the trial court's finding that the Children have done well in foster care, and that the foster parents have satisfactorily met the Children's medical and developmental needs. Father expresses concern, however, that the trial court placed no weight on the fact that A.T.P. broke his femur while in the foster care placement, and he contends that the trial court should

- 18 -

have weighted this fact more heavily.[5]  Given the evidence of record in this matter, we do not agree with Father that the trial court failed to afford this incident any weight.

We have explained that while the focus in terminating parental rights under section 2511(a) is on the parent, under section 2511(b) it is on the child.  *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa.Super. 2008) (*en banc*).  In reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child."  23 Pa.C.S. § 2511(b).  The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability."  *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012).  In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child.  The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.  *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond,

---

[5] Ms. Lopez testified, on cross-examination by Father's counsel, that A.T.P. had broken his femur while playing with his sibling while in foster care.  N.T., 6/8/16, at 25.  Ms. Lopez also testified that Father was very concerned after A.T.P.'s injury, and appropriately followed up by sending A.T.P. a greeting card.  *Id.*

- 19 -

the court is not required to use expert testimony.  Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P.,* 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).  Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child."  *In re K.Z.S.*, 946 A.2d 753, 762 (Pa.Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound.  If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . .  Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists.  The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa.Super. 2008) (internal citations and quotation marks omitted).  Thus, the court may emphasize the safety needs of the child.  *See In re K.Z.S.*, 446 A.2d at 763-764 (affirming the involuntary termination of the mother's parental rights, despite the existence

- 20 -

of some bond, where placement with the mother would be contrary to the child's best interests, and any bond with the mother would be fairly attenuated when the child was separated from her, almost constantly, for four years).

In fact, our Supreme Court has observed that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, and that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." *See In re: T.S.M.*, 71 A.3d at 267 (quoting *In re K.K.R.-S.*, 958 A.2d at 535)). The Supreme Court instructed, "[t]he continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." *Id.* (quoting *In re Involuntary Termination of C.W.S.M.*, 839 A.2d 410, 418 (Pa.Super. 2003) (Tamilia, J. dissenting)).

We have explained that "[a] parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." *In re Z.P.*, 994 A.2d at 1121. Further, this Court has stated: "[A] parent's basic constitutional right to the custody and rearing of his . . . child is converted, upon the failure to fulfill his . . . parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa.Super.

2004) (internal citations omitted). It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

Regarding section 2511(b), the trial court found as follows:

> Pursuant to subsection (b), the Court must give primary consideration to the children's developmental, physical, and emotional needs and welfare, and that analysis clearly favors termination. While in Mother and Father's care, [A.T.P.], [L.R.P.], and [T.M.J.P.] suffered from severe neglect. Whether through lack of understanding or lack of concern, both parents failed to provide the physical, mental, and emotional stimuli essential to their children's proper development. As a result, they experienced profound developmental delays and never established primary bonds with either parent. Consequently, it was no more meaningful for them to see Mother and Father at CenClear or CYS's offices than it was to see Dr. Ryen or their service providers.
>
> Conversely, the [foster parents] have gained a place of importance in the children's hearts, and it is thus [foster mother] they are happy to see and go home with when parental visits are over. As detailed above, moreover, it is the [foster parents] who have attended to the children's physical, mental, emotional, and medical needs since they were removed from their birth parents' home, and it is because of them and their willingness to attend to the children's special needs that they have made the progress they have.
>
> E.J. is additional evidence, and perhaps the most convincing of all, that termination is in the children's best interests. Having been placed with the [foster parents] as a newborn, he was never exposed to the social and cultural deprivation his siblings experienced and thus has

- 22 -

not suffered from the attendant developmental delays. Rather, he is developing normally in every respect – a fact that is directly attributable to his not having been exposed to Mother and Father's neglectful parenting habits.

Because CYS has proven clearly and convincingly that termination is appropriate under 23 Pa.C.S.A. § 2511(a)(2), (a)(5), and (a)(8) and that it will best meet the children's needs pursuant to subsection (b), therefore, the Court will enter a decree terminating the parental rights of Mother and Father with respect to both [sic] children.

Trial Court Op., 6/17/16, at 8-9.

After a careful review of the record in this matter, we find the record supports the trial court's factual findings, and the court's conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of S.P.*, 47 A.3d at 826-27. Accordingly, it was proper for the trial court to find no bond exists such that the Children would suffer permanent emotional harm if Father's parental rights were terminated. This Court finds no abuse of discretion in the trial court's termination of Father's parental rights to the Children pursuant to section 2511(b). We, therefore, affirm the decree terminating Father's parental rights with regard to the Children under section 2511(a)(2) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/29/2016</u>