J-S11030-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: A.L.C., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: S.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1539 WDA 2019 |

Appeal from the Decree Entered October 2, 2019
In the Court of Common Pleas of Beaver County Orphans' Court at
No(s): CP-04-DP-0000038-2017

| | | |
|---|---|---|
| IN RE: A.D.G.C., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: S.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1540 WDA 2019 |

Appeal from the Decree Entered October 2, 2019
In the Court of Common Pleas of Beaver County Orphans' Court at
No(s): CP-04-DP-0000039-2017

BEFORE:  NICHOLS, J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY MURRAY, J.:                    **FILED MAY 6, 2020**

S.G. (Mother) appeals from the October 2, 2019 decrees involuntarily

terminating her parental rights to her daughter, A.L.C., born in March of 2015,

and her son, A.D.G.C., born in February of 2017 (collectively, Children).[1] Upon review, we affirm.

On May 30, 2019, Beaver County Children and Youth Services (CYS) filed petitions for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (9), and (b). On July 22 and 23, 2019, the Honorable Mitchell Shahen[2] held a hearing on the petitions,[3] during which CYS presented the testimony of its caseworkers, Amy Frederic and Eleanor Whittier. In addition, CYS introduced into evidence, and the court admitted, ten exhibits consisting of Children's dependency orders. Mother was transported to the hearing from State Correctional Institution Cambridge Springs, where she is incarcerated. Mother testified on her own behalf.

The record reveals that the juvenile court placed Children in the custody of CYS on August 21, 2017, due to A.D.G.C., then six months old, suffering an acute spiral fracture to his left humerus. Orphans' Court Opinion, 11/12/19, at 4-5 (citing Adjudication and Disposition); N.T., 7/22/19, at 90.

---

[1] The Children's natural father is A.C., who voluntarily relinquished his parental rights during the proceeding on July 22, 2019. However, the certified docket does not reveal that the orphans' court issued decrees terminating A.C.'s parental rights.

[2] Judge Shahen also presided over the underlying dependency proceedings starting with the first permanency review hearing on March 2, 2018.

[3] During the hearing, Robert Dappenbrook, Esquire, served as Children's counsel, and Mollie Patterson, Esquire, served as Children's guardian *ad litem* (GAL).

In addition, x-rays revealed that A.D.G.C. had six to seven broken bones that were in various stages of healing. Orphans' Court Opinion, 11/12/19, at 5.

On December 19, 2017, the court adjudicated Children dependent and found A.D.G.C. to be a victim of "child abuse" pursuant to 23 Pa.C.S. § 6303 (Definitions). Children's permanency goal was reunification. On March 7, 2018, the court ordered a concurrent goal of adoption. Permanency review hearings occurred at regular intervals from March 2, 2018, until July 1, 2019, when the court changed Children's permanency goal to adoption.

On January 28, 2019, the juvenile court issued an aggravated circumstances order against Mother due to her convictions of crimes related to her physical abuse of A.D.G.C.[4] Specifically, on November 1, 2018, Mother was convicted of aggravated assault, simple assault, recklessly endangering another person, and endangering the welfare of children. N.T., 7/22/19, at 74. Mother was sentenced to a term of incarceration of five to ten years. N.T., 7/23/19, at 54.

In the aggravated circumstances order, the court directed that no efforts be made to reunify Children with Mother. Likewise, in the permanency review orders dated January 28, 2019, the court directed that no efforts be made

---

[4] In addition to the subject proceedings and the underlying dependency cases, Judge Shahen presided over Mother's jury trial on her criminal charges. Following Mother's convictions, Judge Shahen imposed her sentence.

toward reunification. In addition, the court offered Mother one final visit with Children, which occurred in February of 2019, and then suspended all visits.

By decrees dated and entered September 12, 2019, the orphans' court involuntarily terminated Mother's parental rights. For the purpose of correcting a clerical error, the court amended the decrees and involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (9), and (b). The court entered the amended decrees on or about October 2, 2019.

On October 10, 2019, Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*. The orphans' court filed its Rule 1925(a) opinion on November 12, 2019.

Mother raises the following issues for our review:

1. Whether the [orphans'] court erred in finding that [Mother] refused and/or failed to perform her parental duties, as [Mother] did not make reasonable efforts to remain a part of Children's lives[?]

2. Whether the [orphans'] court erred in finding that [Mother] refused to acknowledge that the injuries occurred or to assist in determining how the injuries occurred[?]

3. Whether the [orphans'] court erred in finding that [Mother] is not ready to take a protective stance with regards to [C]hildren or attempt to remedy the issues that caused the initial placement[?]

4. Whether the [orphans'] court erred in finding that the conditions that led to the removal continue to exist[?]

5.    Whether the [orphans'] court . . . erred in finding that [Mother] was not able or willing to remedy the conditions that led to the removal[?]

6.    Whether the [orphans'] court erred in finding that the [t]ermination of [Mother]'s parental rights would not have a detrimental effect on Children and would be in their best interest[?]

7.    Whether the [orphans'] court abused its discretion in denying [Mother]'s request for recusal of the [t]rial [c]ourt [j]udge on the basis that a conflict of interest existed[?]

Mother's Brief at 5-6.

We review Mother's issues according to the following:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  The trial court's decision, however, should not be reversed merely because the record would support a different result.  We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a).  Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of

- 5 -

the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We need only agree with the orphans' court as to any one subsection of 2511(a), as well as Section 2511(b), in order to affirm. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In this case, in her concise statements and her brief, Mother has failed to challenge the decrees under Section 2511(a)(9). As such, Mother has waived any challenge to the decrees under Section 2511(a)(9), and we affirm under this subsection.[5] *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2006) (concluding that the appellant waived challenges regarding Sections 2511(a) and (b) by not including those claims in her statement of questions presented and in failing to develop an argument).

Even if Mother did not waive a challenge to the decrees under Section 2511(a)(9), we would conclude that the certified record supports the decrees pursuant to this subsection, as well as Section 2511(b), which provide as follows.

_____

[5] Based on this disposition, to the extent Mother argues in her first, second, third, fourth, and fifth issues that the orphans' court abused its discretion in terminating her parental rights pursuant to Section 2511(a)(1) and (2), we do not review them.

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

**(9)** The parent has been convicted of one of the following in which the victim was a child of the parent:

**(i)** an offense under 18 Pa.C.S. Ch. 25 (relating to criminal homicide);

**(ii)** a felony under 18 Pa.C.S. § 2702 (relating to aggravated assault);

**(iii)** an offense in another jurisdiction equivalent to an offense in subparagraph (i) or (ii); or

**(iv)** an attempt, solicitation or conspiracy to commit an offense in subparagraph (i), (ii) or (iii).

. . .

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(9) and (b).

Instantly, the record includes a verdict sheet revealing that, on November 1, 2018, a jury found Mother guilty of felony criminal charges under 18 Pa.C.S.A. § 2702(a)(1) and (9). **See** GAL Exhibit "A." In addition, Mother concedes that her "criminal charges were directly stemming from the alleged

abuse/injuries of the minor child, A.D.G.C." Mother's Brief at 9. Thus, we would conclude that Mother's conduct warranted termination under Section 2511(a)(9)(ii).

With respect to Section 2511(b), Mother baldly asserts in her sixth issue that she has a parent-bond with Children that, if terminated, "would irreparably harm the mental well-being of" Children. Mother's Brief at 24. We disagree.

This Court has stated, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted). This Court has explained:

> The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387,

397 (Pa. Super. 2003).  As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.  Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

Our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268.  The Court directed that, in weighing the bond considerations pursuant to Section 2511(b) "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269.  The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly.  When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

In this case, the orphans' court found that involuntarily terminating Mother's parental rights would not have a detrimental effect upon Children. The testimonial evidence supports the court's finding, as follows.

At the time of their placement in August of 2017, A.D.G.C. was six months old, and A.L.C. was nearly two and one-half years old.  CYS initially scheduled visits between Mother and Children three days per week for two

hours at each visit. N.T., 7/22/19, at 57. In June of 2018, Mother requested that she visit with Children two days per week, instead of three, for a total of six hours. *Id.* at 57-58. Eleanor Whittier, the CYS caseworker, testified that Mother attended 60% of the visits offered prior to her incarceration on November 1, 2018. N.T., 7/23/19, at 44. While incarcerated, Mother had seven visits with Children. *Id.* at 43. Mother's final visit with Children was on February 4, 2019, pursuant to the permanency review orders on January 28, 2019, granting her one final visit. N.T., 7/22/19, at 58. As such, by the time of the subject proceeding, Children had not seen Mother in more than five months.

The CYS caseworkers, Amy Frederick and Eleanor Whittier, testified that they observed a bond between A.L.C. and Mother. N.T., 7/22/19, at 60; N.T., 7/23/19, at 21. However, Ms. Frederick testified, "it has been . . . over five months since the last visit, so I'm not sure where the level of bond would be at this time." N.T., 7/22/19, at 60. With respect to A.D.G.C., the caseworkers did not testify with respect to a bond between him and Mother. In any event, Ms. Frederick testified that A.D.G.C. is "a very easy-going, social child, and he smiles and interacts and socializes and raises his hands to almost any adult both familiar and unfamiliar." *Id.* at 61. In addition, Ms. Whittier testified on inquiry by the orphans' court:

> THE COURT: Did you notice after the visits stopped with [M]other in February after that last visit whether [C]hildren were upset, whether they had . . . required any special attention, things like that?

- 10 -

[A.] No, they did not.

N.T., 7/23/19, at 48. Further, with respect to A.L.C., the older child, Ms. Whittier testified on cross-examination by Mother's counsel:

Q. To the best of your knowledge has [A.L.C.] ever mentioned missing [Mother] or wanting to see her?

. . .

A.     So I am not there whenever she has talked about visits with [M]other. . . . [The foster mother] has told me that [A.L.C.] has not asked about visits. However, there have been times when she has asked about seeing Miss Shannon, which would be the Project Star worker [who supervised visits], or the previous Project Star worker, Miss Faith.

N.T., 7/23/19, at 37-38. The foregoing evidence supports the court's conclusion that involuntarily terminating Mother's parental rights will not have a detrimental effect upon Children.

In addition, the evidence reveals that Children have resided in a pre-adoptive foster home since June of 2018. N.T., 7/22/19, at 77; N.T., 7/23/19, at 17. Ms. Whittier, who frequently visited Children in their foster home, testified that Children are bonded to their foster parents. N.T., 7/23/19, at 13. Specifically, Ms. Whittier testified on direct examination:

Q. What interactions have you observed between [C]hildren in the foster parents?

. . .

A.     So in regards to their bond based on my observations [C]hildren are excited to see the family. . . . They look to [their foster parents] for guidance and reassurance. When [C]hildren are upset[,] they seek out [their foster parents].

They are excited to show [their foster parents] their different achievements, and they're learning new skills.

They're not only comfortable in their home, in the home, but they're also thriving there. . . .

N.T., 7/23/19, 18.

Moreover, the court found that the safety of A.D.G.C. "would be severely at risk" if he was returned to the care of Mother. Orphans' Court Opinion, 11/12/19, at 40. The court explained, in part, "Mother did not provide any credible explanations for the injuries to A.D.G.C. Mother refused to acknowledge six of the seven fractures even existed. Mother did nothing to identify what caused such parenting failures and failed to accept that they were the result of her actions." *Id.*

Indeed, Mother testified that A.L.C., who was nearly two and one-half years old at the time of the incident, caused A.D.G.C.'s spiral fracture to his humerus by "tugging on his arm." N.T., 7/23/19, at 92. In addition, with respect to the additional fractures sustained by A.D.G.C., Mother denied that they existed. *Id.* at 79. Mother subsequently stated that she "was never aware of no other injuries." *Id.* at 80. Based on the foregoing, we discern no abuse of discretion by the orphans' court in concluding that the involuntary termination of Mother's parental rights serves the developmental, physical, and emotional needs and welfare of Children pursuant to Section 2511(b).

In Mother's final issue, she argues that the orphans' court abused its discretion in denying her motion for recusal. Specifically, Mother asserts, "[A]

conflict of interest was present, due to the co-mingling of her criminal case, . . . post-sentencing motions,[6] dependency and termination." Mother's Brief at 19. We disagree.

We review the order denying Mother's motion for recusal for an abuse of discretion, and we "extend extreme deference" to the court's decision. *Vargo v. Schwartz*, 940 A.2d 459, 471 (Pa. Super. 2007). This Court has explained:

> A trial judge should recuse himself whenever he has any doubt as to his ability to preside impartially . . . or whenever he believes his impartiality can be reasonably questioned. It is presumed that the judge has the ability to determine whether he will be able to rule impartially and without prejudice, and his assessment is personal, unreviewable, and final. Where a jurist rules that he or she can hear and dispose of a case fairly and without prejudice, that decision will not be overturned on appeal but for an abuse of discretion. The party requesting recusal bears the burden of producing evidence that establishes bias, prejudice, or unfairness. This evidence must raise a substantial doubt as to the jurist's ability to preside impartially.

*In re Bridgeport Fire Litigation*, 5 A.3d 1250, 1254 (Pa. Super. 2010) (citations omitted).

By way of background, before any evidence was presented at the commencement of the involuntary termination proceeding on July 22, 2019, Mother's counsel requested on the record in open court that the orphans' court

_____

[6] Mother explains in her Brief that she filed post-sentence motions, and "Re-sentencing on one count was granted by the court. Mother's conviction is currently on appeal with this Court." Mother's brief at 12. Our review reveals that Mother has an appeal pending from the order denying her post-sentence relief and the re-sentencing order, which is docketed at 1129 WDA 2019.

recuse itself. Mother's counsel stated as follows, in part: the same [c]ourt that heard the criminal action in which those charges are intertwined with this dependency case. The allegations for the criminal case are the same allegations that are here that were founded on aggravated circumstances and got us to an involuntary termination hearing.

> In addition to that this [c]ourt is hearing . . . resentencing of my client. We feel that there is a substantial conflict of interest that is in this case, and as such, we are requesting that this involuntary termination hearing be heard by a different Judge just so that we can eliminate any type of potential conflict that could raise an issue throughout the duration of the involuntary termination hearing.

N.T., 7/22/19, at 18.

The orphans' court denied Mother's motion for recusal on the record in open court. *See* N.T., 7/22/19, at 25. In so doing, the court specifically explained that the criminal trial was a jury trial; therefore, it was the jury, not the court, who made the factual findings. *Id.* at 22. The court emphasized, "The issues in this case . . . arise from the [involuntary termination] petition. . . . [N]one of these [allegations] require me to make findings similar to the elements of the crimes for which [Mother] was convicted." *Id.* The court explained:

> My job is to take the evidence that is presented in this case today or whatever other day there is and not consider the other things to the extent that they're not [in] evidence. . . . And if I couldn't do that, I would stop my analysis right here, and I would ask the court administrator to assign another Judge. . . .

- 14 -

I also don't feel that . . . just generally if the public looked at this it would impugn the integrity of the [c]ourt. There . . . is nothing that will prevent me from just focusing on what needs to be done in this case.

*Id.* at 24-25.

In its Rule 1925(a) opinion, the court applied the law to the facts of this case, stating:

There is no support for Mother's allegation that the [orphans'] court's involvement in Mother's criminal trial, sentencing, or prior dependency proceedings demonstrates any bias or prejudices. ***See Arnold v. Arnold***, 847 A.2d [674,] 681 [(Pa. Super. 2004)] (holding that past "Adverse rulings alone do not establish the requisite bias warranting recusal, especially where the trial judge's rulings are legally proper."); ***In re Quick***, 559 A.2d 42, 46 (Pa. Super. 1989) ("It is unsupportable that an experienced trial judge is incapable of making factual determinations and legal findings in regard to the same child at different hearings . . . without being subject to bias or prejudice."). Furthermore, any knowledge of the parties that this Jurist gained by presiding over the criminal trial and/or dependency proceedings was not detrimental to this case. Regardless of which trial judge presided over the trial and/or sentenced Mother, the fact of Mother's incarceration on the charges involving the abuse to the child at issue in the instant case would have been known at the termination hearing.

Additionally, this Jurist's involvement with the Child[ren]'s goal change, aggravated circumstances hearing, and [d]ependency hearings are appropriate in termination proceedings.

. . .

No one is in a better position to determine whether the parties have fulfilled their mutual responsibilities toward these goals than the Juvenile Court Judge who was involved with the child from the beginning. A new judge will not have the benefit of recall of hearings, reports and directions not fully detailed in the cold or abbreviated reports and records presented at the termination proceeding. That is not to say these recollections will be the basis for the termination decision, which must stand on

- 15 -

its own evidence and be established by clear and convincing evidence. Rather, it will assure the record is full and complete so that termination will not be granted if the agency is overreaching, or termination won't be denied because of a pro forma presentation.

*In re Quick*, 559 A.2d [at 47]. . . .

Orphans' Court Opinion, 11/12/19, 47-48. Based on the foregoing, we discern no abuse of discretion by the orphans' court in denying Mother's request for recusal. Accordingly, we affirm the decrees involuntarily terminating Mother's parental rights.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/6/2020

- 16 -